# **<u>EXHIBIT B</u>**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS
# BOSTON DIVISION

| | |
|---|---|
| STUDENTS FOR FAIR ADMISSIONS, INC., | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| PRESIDENT AND FELLOWS OF HARVARD COLLEGE (HARVARD CORPORATION); and THE HONORABLE AND REVEREND THE BOARD OF OVERSEERS, | **COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Students for Fair Admissions, Inc. brings this action to obtain, among other relief, a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendant President and Fellows of Harvard College ("Harvard Corporation") and The Honorable and Reverend the Board of Overseers ("Board of Overseers" and together with Harvard Corporation, "Defendants" or "Harvard") have employed and are employing racially and ethnically discriminatory policies and procedures in administering the undergraduate admissions program at Harvard College in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI"). Harvard's undergraduate admissions policies and procedures have injured and continue to injure Plaintiff's members by intentionally and improperly discriminating against them on the basis of their race and ethnicity in violation of Title VI.

## I.    **INTRODUCTION**

1.    This is an action brought under Title VI of the Civil Rights Act of 1964 to prohibit Harvard from engaging in intentional discrimination on the basis of race and ethnicity.  "Classifications of citizens solely on the basis of race are by their very nature

odious to a free people whose institutions are founded upon the doctrine of equality. They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citations and quotations omitted). As a consequence, racial classifications are highly disfavored and have been permitted only when there is a compelling government interest that cannot be met through race-neutral means. In the educational setting, "diversity" is the only interest the Supreme Court has found compelling. Even then, the Supreme Court has mandated strict judicial scrutiny to ensure that an academic institution is actually pursuing that interest and that it is absolutely necessary to employ racial preferences in order to achieve a diverse student body.

2.       Yet the Supreme Court has always had misgivings about its decision to permit *any* use of racial preferences in university admissions. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 518 (1989) (Kennedy, J., concurring in part and concurring in the judgment). The Supreme Court was nevertheless convinced to permit racial preferences in pursuit of diversity for two reasons. First, based mainly on an *amicus* brief that Harvard submitted, the Supreme Court was led to believe that schools only would "take account of race as one, nonpredominant factor in a system designed to consider each applicant as an individual." *Grutter v. Bollinger*, 539 U.S. 306, 387 (2003) (Kennedy, J., dissenting) (citing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-91 (1978)). Second, the Supreme Court believed that the "strict scrutiny standard [would] operate in a manner generally consistent with the imperative of race neutrality, because it forbids the use even of narrowly drawn racial classifications except as a last resort."

*Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

3. The Supreme Court was misled. The admissions plan Harvard advocated for in *Bakke* (the "Harvard Plan") that promised to treat each applicant as an individual has always been an elaborate mechanism for hiding Harvard's systematic campaign of racial and ethnic discrimination against certain disfavored classes of applicants. Indeed, the Harvard Plan was created for the specific purpose of discriminating against Jewish applicants. Put simply, *Bakke* "legitimated an admissions process that is *inherently capable* of gross abuse and that … *has in fact been deliberately* manipulated for the specific purpose of perpetuating religious and ethnic discrimination in college admissions." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979). Today it is used to hide intentional discrimination against Asian Americans. Harvard is using the same "holistic" code words to discriminate for the same invidious reasons and it is relying on the same pretextual excuses to justify its disparate treatment of another high-achieving racial and ethnic minority group.

4. In any event, even if the Harvard Plan at some point outgrew its discriminatory roots, Harvard has long since abandoned an admissions policy that purported to merely use race contextually to fill the last few seats in the entering freshman class. Harvard now labels every applicant by race on the claim that it is pursuing the so-called "critical mass" diversity objective. That creates two problems for Harvard. First, as it has abandoned the very "plan" that led the Supreme Court to permit the use of racial admissions preferences, Harvard has deprived the Court of any

3

continuing "authority to approve the use of race in pursuit of student diversity." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting). Second, Harvard's new diversity interest—critical mass—should never have been endorsed and should be outlawed once and for all. "[T]he concept of critical mass is a delusion used … to mask [an] attempt to make race an automatic factor in most instances and to achieve numerical goals indistinguishable from quotas." *Id.* at 389.

5.     Worse still, Harvard is not even pursuing its claimed "critical mass" interest. Rather, even under governing Supreme Court precedent, Harvard is violating Title VI for at least four reasons. First, Harvard is using racial classifications to engage in the same brand of invidious discrimination against Asian Americans that it formerly used to limit the number of Jewish students in its student body. Statistical evidence reveals that Harvard uses "holistic" admissions to disguise the fact that it holds Asian Americans to a far higher standard than other students and essentially forces them to compete against each other for admission. There is nothing high-minded about this campaign of invidious discrimination. It is "illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493.

6.     Second, Harvard is engaging in racial balancing. Over an extended period, Harvard's admission and enrollment figures for each racial category have shown almost no change. Each year, Harvard admits and enrolls essentially the same percentage of African Americans, Hispanics, whites, and Asian Americans even though the application rates and qualifications for each racial group have undergone significant changes over time. This is not the coincidental byproduct of an admissions system that treats each applicant as an individual; indeed, the statistical evidence shows that Harvard

modulates its racial admissions preference whenever there is an unanticipated change in the yield rate of a particular racial group in the prior year. Harvard's remarkably stable admissions and enrollment figures over time are the deliberate result of systemwide intentional racial discrimination designed to achieve a predetermined racial balance of its student body.

7. Third, Harvard is failing to use race merely as a "plus factor" in admissions decisions. Rather, Harvard's racial preference for each student (which equates to a penalty imposed upon Asian-American applicants) is so large that race becomes the "defining feature of his or her application." *Grutter*, 539 U.S. at 337. Only using race or ethnicity as a dominant factor in admissions decisions could, for example, account for the remarkably low admission rate for high-achieving Asian-American applicants. Harvard's admissions decisions simply are not explainable on grounds other than race. High-achieving Asian-American applicants are as broadly diverse and eclectic in their abilities and interests as any other group seeking admission to Harvard. They compete in interscholastic sports, are members of the school band, work part-time jobs after school, travel, and engage in volunteer work just like everyone else. It is not a lack of non-academic achievement that is keeping them from securing admission. It is Harvard's dominant use of racial preferences to their detriment.

8. Fourth, and last, Harvard is using race in admissions decisions when race-neutral alternatives can achieve diversity. As other elite universities have shown, increased utilization of non-race-based criteria, such as socioeconomic preferences, can promote diversity about as well as racial preferences. This approach is particularly effective when combined with increased use of financial aid, scholarships, and

recruitment to attract and enroll minority applicants and the elimination of admissions policies and practices, such as legacy preferences and early admission, which operate to the disadvantage of minority applicants. Further, eliminating racial preferences at Harvard will alleviate the substantial harm these discriminatory policies cause to those minority applicants who receive such admissions preferences, the Harvard community, and society as a whole. Racial preferences are a dangerous tool and may only be used as a last resort. There is now overwhelming evidence that race-neutral alternatives render reliance on racial preferences unnecessary. It is incumbent on Harvard to take full advantage of these preferred alternatives.

9.     Accordingly, there is no doubt that Harvard is in violation of Title VI. The only question is the proper judicial response. Given what is occurring at Harvard and at other schools, the proper response is the outright prohibition of racial preferences in university admissions—period. Allowing this issue to be litigated in case after case will only "perpetuate the hostilities that proper consideration of race is designed to avoid." *Grutter*, 539 U.S. at 394 (Kennedy, J., dissenting). Harvard and other academic institutions cannot and should not be trusted with the awesome and historically dangerous tool of racial classification. As in the past, they will use any leeway the Supreme Court grants them to use racial preferences in college admissions—under whatever rubric—to engage in racial stereotyping, discrimination against disfavored minorities, and quota-setting to advance their social-engineering agenda. Strict scrutiny has proven to be no match for concerted discrimination hidden behind the veil of "holistic" admissions. There may be times when social problems can be solved democratically. But massive resistance to racial equality is not one of them. *See Brown v. Bd. of Educ. of Topeka,*

*Kan.*, 349 U.S. 294 (1955). "The moral imperative of racial neutrality is the driving force of the Equal Protection Clause …. Structural protections may be necessities if moral imperatives are to be obeyed." *Croson*, 488 U.S. at 518 (Kennedy, J., concurring in part and concurring in the judgment).

## II.    JURISDICTION AND VENUE

10.    This action arises under 42 U.S.C. § 2000d *et seq.* This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

11.    Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 because the events giving rise to the claims detailed herein occurred in the District of Massachusetts.

## III.    THE PARTIES

### A.    **Plaintiff**

12.    Plaintiff, Students for Fair Admissions, Inc. ("SFFA") is an Internal Revenue Code Section 501(c)(3) organization formed for the purpose of defending human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means. More specifically, SFFA seeks to promote and protect the right of the public to be free from discrimination on the basis of race in higher education admissions.

13.    SFFA is a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their parents, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions. SFFA has members throughout the country.

14.     Edward Blum is the President of SFFA.  *See **Exhibit A***, Declaration of Edward Blum ("Blum Dec.") ¶ 2.

15.     SFFA has at least one member ("Applicant") who applied for and was denied admission to Harvard's 2014 entering class.  Blum Dec. ¶ 4.

16.     Applicant is Asian American.  Blum Dec. ¶ 5.

17.     Applicant's parents are first-generation immigrants to the United States from China.  Blum Dec. ¶ 6.

18.     Applicant graduated from high school ranked 1 out of 460 students by weighted and un-weighted grade point average. Blum Dec. ¶ 7.

19.     U.S. News and World Report ranks Applicant's high school in the top 5 percent of all high schools in the United States.  Blum Dec. ¶ 8.

20.     Applicant achieved a perfect score of 36 on the ACT.  Applicant achieved a perfect score of 800 for SAT II History and a perfect score of 800 for SAT II Math. Among other academic achievements, Applicant was named an AP Scholar with distinction, a National Scholar, and a National Merit Scholarship semifinalist.  Blum Dec. ¶¶ 9-10.

21.     While in high school, Applicant participated in numerous extracurricular and volunteer activities.  Among other things, Applicant was captain of the varsity tennis team, volunteered at a community tennis camp, volunteered for the high school's student peer tutoring program, was a volunteer fundraiser for National Public Radio, and traveled to China as part of a program organized by the United States Consulate General and Chinese American Students Education and Exchange to assist students in learning English writing and presentation skills.  Blum Dec. ¶ 11.

22.     Applicant was denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  Blum Dec. ¶ 12.

23.     Applicant was accepted to and has enrolled at a university that is ranked in the Top 20 in the nation by U.S. News and World Report.  That university does not grant an admissions preference on the basis of race or ethnicity.  Blum Dec. ¶ 13.

24.     Applicant is ready, able, and intends to seek to transfer to Harvard when it ceases the use of race or ethnicity as an admissions preference and ceases its intentional discrimination against Asian Americans.  Blum Dec. ¶ 14.

25.     SFFA has members who are currently in high school and intend to apply for admission to Harvard ("Future Applicants").  Some of these Future Applicants are Asian American.  Blum Dec. ¶ 15.

26.     Future Applicants will be denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  As a result, Future Applicants may be denied admission to Harvard because of these discriminatory policies.  Blum Dec. ¶ 16.

27.     SFFA has members whose children intend to apply for admission to Harvard ("Parents").  Some of these Parents are Asian Americans.  Blum Dec. ¶ 17.

28.     Parents' children will be denied the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to Harvard's discriminatory admissions policies.  As a result, Parents' children may be denied admission to Harvard because of these discriminatory policies.  Blum Dec. ¶ 18.

**B.** __Defendants__

29.     Defendants, the Harvard Corporation and Harvard Board of Overseers govern Harvard University.

30.     Harvard University is a private educational institution based in Cambridge, Massachusetts.

31.     Harvard College is a component of Harvard University that offers undergraduate, graduate, professional, and research programs in the fields of arts, science, medicine, business, design, and public health.

32.     Despite having an endowment of approximately $36.4 billion, Harvard accepts substantial direct financial assistance from the Federal government through, among other things, grants and loans. In 2010, Harvard accepted more than $6.6 million in federal funds. In 2011, Harvard accepted more than $11.9 million in federal funds. In 2012, Harvard accepted more than $20.9 million in federal funds. In 2013, Harvard accepted more than $13.4 million in federal funds. Harvard also has received and will further receive substantial direct financial assistance from the Federal government in 2014.

33.     Harvard also accepts substantial indirect Federal financial assistance by, among other things, enrolling students who pay, in part, with Federal financial aid directly distributed to those students.

34.     As a recipient of Federal financial assistance, Harvard University, and all of its programs and activities, which includes Harvard College, are subject to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et. seq.*

IV.  **HARVARD HAS A LONG HISTORY OF INTENTIONAL DISCRIMINATION ON THE BASIS OF RACE OR ETHNICITY AGAINST DISFAVORED MINORITY APPLICANTS.**

35.  Discrimination on the basis of race or ethnicity is longstanding at Harvard. The "Harvard Plan" itself—and the concept of an admissions system based on a "holistic" review of applicants instead of admission based on academic qualifications—was formulated for the specific purpose of discriminating against disfavored minority groups. "Indeed, the historical evidence points inexorably to the conclusion that the current Harvard College admissions system was *born* out of one of the most shameful episodes in the history of American higher education in general, and of Harvard college in particular." Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979).

A.  **1900s to 1920s: Before "Selective Admissions"**

36.  Until the early 1920s, Harvard, like all other Ivy League schools, selected its students by admitting applicants who passed a required examination.

37.  Because Harvard's entrance examination was not especially demanding, an applicant for undergraduate admission with average intelligence from a prominent school could usually pass with ease.

38.  Though the performance of some students placed them in a gray zone from which they could be admitted "with conditions," most applicants were admitted based solely on objective academic criteria.

39.  Under this system, the number of students entering Harvard fluctuated, sometimes quite widely, from year to year.

40.     Harvard's student body during this time period was fairly homogenous in terms of class, race, religion, and ethnicity.  Students during this time period were overwhelmingly from affluent backgrounds, almost exclusively white, and composed largely of graduates of elite private secondary schools.

41.     Harvard was considered somewhat open to African Americans, immigrants, and foreigners, though the numerical presence of each of these groups of students on campus was relatively small.

**B.      1920s to 1930s: Harvard's "Jewish Problem"**

42.     Ivy League schools began to reevaluate their admissions systems when students deemed socially "undesirable"—most prominently, Jewish applicants—started to pass the examinations and enroll in greatly increasing numbers.

43.     In or around the late 1910s, the number of Jewish students enrolling at Harvard began to increase, and Harvard administrator determined that the college had a "Jewish problem" that it needed to address.

44.     By 1918, Harvard's freshman class was 20 percent Jewish, three times the percentage at Yale and six times that at Princeton.

45.     The President of Harvard, A. Lawrence Lowell, was deeply troubled by this rising Jewish population.

46.     President Lowell feared that the enrollment of too many Jewish students would cause students from Protestant upper and upper-middle class families to choose other elite colleges over Harvard.

47.     In 1920, in a letter to William Hocking, a Harvard philosophy professor, President Lowell wrote that the increasing number of Jewish students enrolling at Harvard would ultimately "ruin the college."

48.     To combat this "Jewish problem," President Lowell sought to institute a cap on Jewish enrollment in each entering class.

49.     In his letter to Hocking, President Lowell stated that the best approach would be "to state frankly that we thought we could do the most good by not admitting more than a certain proportion of men in a group that did not intermingle with the rest, and give our reasons for it to the public." According to Lowell, "[e]xperience seems to place that proportion at about 15%."

50.     Yet President Lowell knew that such overt discrimination would meet resistance. He believed that the faculty, and probably the governing boards, would prefer to make a rule whose motive was less obvious on its face, such as giving to the Committee on Admission authority to refuse admittance to persons who possessed particular qualities believed to be characteristic of Jewish applicants.

51.     If such a system was instituted, however, President Lowell wished to ensure that the faculty knew "perfectly well what they are doing, and that any vote passed with the intent of limiting the number of Jews should not be supposed by anyone to be passed as a measurement of character really applicable to Jews and Gentiles alike."

52.     By the spring of 1922, the proportion of Jewish students had reached 21.5 percent. President Lowell warned that unless immediate measures were taken "the danger would seem to be imminent."

53.     President Lowell made clear that absent the rise in Jewish enrollment, no change in Harvard's admissions policies would be needed. The problem was not with the academic method of selection *per se*, but with its results: it was now yielding too many Jewish students at Harvard.

54.     In a 1922 letter President Lowell wrote: "We can reduce the number of Jews by talking about other qualifications than those of admission examinations.  If the object is simply to diminish the Jews, this is merely an indirect method of avoiding a problem in American life which is really important.  This is the feeling of the most thoughtful people here, both gentile and Jew.  On the other hand, we are in no present danger of having more students in college than we can well take care of; nor, apart from the Jews, is there any real problem of selection, the present method of examination giving us, for the Gentile, a satisfactory result."

55.     In May 1922, Professor Ropes proposed that the Committee on Admission "take into account the proportionate size of racial and national groups in the membership of Harvard College," declaring that "it is not desirable that the number of students in any group which is not easily assimilated into the common life of the College should exceed 15 percent of the whole college."

56.     As one Harvard alumnus noted, "I am fully prepared to accept the judgment of the Harvard authorities that a concentration of Jews in excess of fifteen percent will produce a segregation of culture rather than a fusion."

57.     President Lowell's plans received pushback.  One petition, signed by 31 faculty members, described the "action of the Faculty relating to controlling the percentage of the Jews in Harvard College" as "a radical departure from the spirit and

14

practice of the College" and declared "that racial consideration should not influence the Committee on Admission before a careful and deliberate study of the whole question of the Jews shall be made by the Faculty."

58.     At the same time, Harvard was beginning to gather the information that would permit it to identify which applicants were Jewish.

59.     Starting in the fall of 1922, applicants were required to answer questions on "Race and Color," "Religious Preference," "Maiden Name of Mother," and "Birthplace of Father," as well as the question, "What change, if any, has been made since birth in your own name or that of your father? (Explain fully.)"

60.     In addition, Harvard asked high school principals and private school headmasters to fill out a form indicating "by a check [the applicant's] religious preference so far as known . . . Protestant . . . Roman Catholic . . . Hebrew . . . Unknown."

61.     Harvard also created a committee tasked with counting the number of Jewish students at Harvard.

62.     After analyzing all the student information it could obtain, the committee began classifying each Harvard student into one of four categories: "J1," "J2," "J3," and "other."   A "J1" was assigned "when the evidence pointed conclusively to the fact that the student was Jewish;" a "J2" was assigned when a "preponderance of evidence" suggested the student was Jewish; and a "J3" was assigned when "the evidence suggested the possibility that the student might be Jewish."

63.     During this time period, Harvard also adopted a "one-seventh plan," which purported to target "a new group of men from the West and South" who were in the top

seventh of their graduating class. In reality, however, it was a "thinly disguised attempt to lower the Jewish proportion of the student body by bringing in boys—some of them academically ill equipped for Harvard—from regions of the country where there were few Jews."

64.     After President Lowell's intentions of imposing a Jewish cap became known to the public, opponents began mobilizing opposition.

65.     In 1923, Harvard's Committee on Methods of Sifting Candidates for Admission defeated President Lowell's requests for a cap on Jewish enrollment. In doing so, the committee issued a statement indicating its opposition to "an arbitrary limitation of the number of students to be admitted" and specifying that "if the size of our Freshman class is to be reduced, the reduction can best be accomplished by raising the standard for admission."

66.     Despite this defeat, President Lowell pressed forward. In June 1923, he commissioned a study to determine "whether it might be wise to limit the number of students admitted to the Freshman class to one thousand."

67.     President Lowell realized that a ceiling on the size of the class was the necessary precondition for addressing the "Jewish problem," for as long as Harvard had an absolute standard of admission, discretionary selection policy using nonacademic as well as academic criteria would not be possible.

68.     Lowell's proposal "signaled the beginning of a new, more subtle campaign to restrict Jewish enrollment."

69.     By the end of 1923, President Lowell's committee issued a report recommending a limit of 1,000 on the size of the freshman class and additional changes

in the criteria for admission.   Instead of making decisions based on academic achievement, the committee proposed using letters from teachers and personal interviews to shed light on the candidates' "aptitude and character."   However, no changes were made in 1923.

70.     By 1924, Harvard's Jewish enrollment had risen to 25 percent.

71.     According to President Lowell, Harvard's "reputation of having so many Jews" was hurting its ability to "attract applicants from western cities and the great preparatory schools."

72.     By 1925, the dean's office reported that the proportion of known Jewish freshmen (the J1s and J2s) had risen to 27.6 percent, with an additional 3.6 percent in the J3 category.

73.     As President Lowell was contemplating these figures, he was receiving letters from alumni castigating the school for being overrun by Jewish students.   Among these letters was one from W.F. Williams '01, who had attended a recent Harvard-Yale football game.   Williams recommended using the school's admissions program to discretely limit the number of Jewish students enrolling at Harvard: "Naturally, after twenty-five years, one expects to find many changes but to find that one's University had become so Hebrewized was a fearful shock. There were Jews to the right of me, Jews to the left of me, in fact they were so obviously everywhere that instead of leaving the Yard with pleasant memories of the past I left with a feeling of utter disgust of the present and grave doubts about the future of my Alma Mater . . . . The Jew is undoubtedly of high mental order, desires the best education he can get CHEAPEST, and is more persistent than other races in his endeavors to get what he wants.   It is self evident, therefore, that

by raising the standard of marks he can't be eliminated from Harvard, whereas by the same process of raising the standard 'White' boys ARE eliminated. And is this to go on? Why the Psychology Test if not to bar those not wanted? Are the Overseers so lacking in genius that they can't devise a way to bring Harvard back to the position it always held as a 'white man's' college?"

74.     President Lowell agreed with Williams' assessment, responding that he "had foreseen the peril of having too large of a number of an alien race and had tried to prevent it," but that "not one of the alumni ventured to defend the policy publicly." President Lowell was "glad to see from your letter, as I have from many other signs, that the alumni are beginning to appreciate that I was not wholly wrong three years ago in trying to limit the proportion of Jews."

75.     Despite increasing alumni approval, President Lowell still faced significant obstacles to his plan. He needed Harvard's "Special Committee on the Limitation of the Size of the Freshman Class" to approve his new admissions plan.

76.     In a letter to the chairman of the committee, President Lowell wrote that "questions of race," though "delicate and disagreeable," were not solved by ignoring them. The solution was a new admissions system giving the school wide discretion to limit the admission of Jewish applicants: "To prevent a dangerous increase in the proportion of Jews, I know at present only one way which is at the same time straightforward and effective, and that is a selection by a personal estimate of character on the part of the Admissions authorities, based upon the probable value to the candidate, to the college and to the community of his admission. Now a selection of this kind can be carried out only in case the numbers are limited. If there is no limit, it is impossible to

reject a candidate who passes the admissions examinations without proof of defective character, which practically cannot be obtained. The only way to make a selection is to limit the numbers, accepting those who appear to be the best."

77.     Anticipating pushback, President Lowell insisted that he was not proposing to discriminate against Jewish applicants. Instead, he sought "discrimination among individuals in accordance with the probable value of a college education to themselves, to the University, and the community," carefully adding that "a very large proportion of the less desirable, upon this basis, are at the present time the Jews."

78.     The committee's chairman was initially opposed, stating that "[e]verything in my education and bringing up makes me shrink from a proposal to begin a racial discrimination at Harvard—there's no use my pretending this isn't the case."

79.     In the end, however, the chairman agreed with President Lowell's notion of "a sound and discerning 'discrimination' among individuals" and expressed confidence that "such a discrimination would inevitably eliminate most of the Jewish element which is making trouble."

80.     Nevertheless, the chairman refused to endorse "a candid regulation excluding all but so many or such a proportion of 'Jews.'" Instead, he advised President Lowell that more subtle measures to exclude Jewish applicants would be a wiser approach.

81.     In its report, the Committee made multiple recommendations along these lines. First, the committee recommended that Harvard limit its incoming class to just 1,000 students. Second, it recommended that "the application of the rule concerning candidates from the first seventh of their school be discretionary with the Committee on

Admission." This modification would allow the committee to eliminate from the program high schools that sent too many Jewish students to Harvard.

82. Finally, and most important, the committee rejected an admissions policy that would select the 1,000 students on the basis of scholarship alone. According to the committee, it was "neither feasible nor desirable to raise the standards of the College so high that none but brilliant scholars can enter" and "the standards ought never to be too high for serious and ambitious students of average intelligence."

83. Not only did the faculty adopt these proposals, but it also approved measures making the admissions process even more subjective.

84. In particular, the faculty called on the admissions committee to interview as many applicants as possible to gather additional information on "character and fitness and the promise of the greatest usefulness in the future as a result of a Harvard education."

85. In addition, Harvard began requiring a passport-sized photo "as an essential part of the application for admissions."

86. Harvard also began using "legacy" preferences for the children of alumni as a strategy for reducing the admission of Jewish students.

87. President Lowell was elated by these changes, realizing that they "provided a tremendous opportunity to impose, at long last, the policy of restriction he had favored since 1922."

88. The reduction in Jewish enrollment at Harvard was immediate. The Jewish portion of Harvard's entering class dropped from over 27 percent in 1925 to 15 percent the following year.

89.     For the next 20 years, this percentage (15 percent) remained virtually unchanged.

90.     Harvard's new system of selection was far more complicated than the exam-based system that had preceded it, and implementing it required a new bureaucratic apparatus of information gathering and assessment.

91.     In addition to expanding its administrative staffing apparatus, the new Office of Admissions needed to collect vast quantities of data formerly unnecessary.

92.     The development of a procedure for identifying Jewish applicants was only the first step.  For the first time, candidates were asked to fill out lengthy applications that included demographic information, a personal essay, and a detailed description of extracurricular activities that might demonstrate "leadership" and reveal something about their "character."

93.     The centerpiece of the new system was the personal letter of recommendation, especially those from trusted sources such as alumni and headmasters or teachers from the leading feeder schools.

94.     Finally, to ensure that "undesirables" were identified and to assess important but subtle indicators of background and breeding such as speech, dress, deportment, and physical appearance, a personal interview was required, a final screening device usually conducted by the Director of Admissions or a trusted alumnus.

95.     The new policy permitted the rejection of scholastically brilliant students considered "undesirable," and it granted the director of admissions broad latitude to admit those of good background with weaker academic records.

96.     The key code word used was "character"—a quality thought to be frequently lacking among Jewish applicants, but present congenitally among affluent Protestants.

97.     By emphasizing the inherently subjective character of admissions decisions, Harvard's new system of selection left it free to adapt to changing circumstances by admitting—and rejecting—whomever it wished.

98.     These tools gave admissions officials the power to discriminate, ostensibly on the basis of "objective" evidence.  Any number of reasons could be invoked to deny an applicant. "Selective admissions deflected much criticism precisely because it singled out no single status as 'key.'"

99.     As a consequence, university leaders could deny the existence of any racial or religious quotas, while still managing to reduce Jewish enrollment to a much lower level, and thereafter hold it essentially constant during the decades that followed.

**C.      1930s to 1960s: A Continuation of Policies**

100.    In the 1930s, Harvard continued the discriminatory admissions policies instituted during the previous decade.

101.    Instrumental during this time period was Richard Gummere, who served as Harvard's Chairman of the Committee on Admission from 1934 to 1952.

102.    Gummere continued to use Harvard's opaque admissions system to limit the number of Jewish students enrolling at Harvard.

103.    The key was secrecy.  In 1922, when he was headmaster of William Penn Charter School in Philadelphia, Gummere had recommend that Harvard follow the approach he had employed at his own school: "I feel that Doctor Edsall [a Harvard

22

Case 1:14-cv-14176-ADB   Document 1   Filed 11/17/14   Page 23 of 120

faculty member] has stated the case very correctly and intelligently, as far as the experiences of the Penn Charter School in the Jew problem are concerned. Such action was taken very definitely, and a very limited number of Jews is admitted; in fact, it is at present almost infinitesimal. We are particularly careful not to make any issue of the matter, and when people of that persuasion wish to be admitted, and we either have enough in the school, or do not feel that the applicant is satisfactory, we employ the same methods of keeping them out of the school as we would any unsatisfactory candidate of any denomination. As a matter of fact, I admitted only one Jew last fall, and plan to admit none this coming fall."

104. Gummere continued the policies of the prior decade laid down by President Lowell, including the establishment of a fixed number of places in the freshman class and a clear statement to both applicants and the public that candidates would not be accepted on academic ability alone.

105. Instead, a multiplicity of nonacademic criteria—alumni connections, athletic talent, geographical diversity, and vague qualities such as "character" and "leadership"—played a pivotal role in determining admission.

106. Similarly, Gummere reported that "increased emphasis is being put on the preliminary interviews." Rather than subjecting undesirable applicants, many of them Jewish, to a formal rejection, the committee preferred to discourage them—politely but firmly—from submitting a final application.

107. For example, in 1936, Irving B. Rosenstein, a Jewish alumnus who had graduated first in his class at Harvard, contacted Dean Hanford about two young Jewish men who were applying for admission. Hanford took notes during his conversation but

did not pass on an endorsement. Instead, he wrote directly to Gummere, stating that "I do not know either Goldberg or Rabinowitz, and I realize that we have quite enough applicants of this type." Nevertheless, Hanford continued, "I felt it my duty to pass along the information that Rosenstein had given me regarding the two boys."

108.    In another case, Jerome Greene, secretary to the Harvard Corporation, explained why a young Jewish man named S. A. Goldstein, who reportedly had high marks on his College Board exams, had been turned down. Mr. Goldstein "came just under the 'weighted average,' which takes all pertinent factors into account." Harvard, he declared, had "no reason to suppose that he is not a creditable representative of his race, many members of which are admitted to Harvard each year." He closed his letter by assuring that "no personal discrimination against him was involved."

109.    During this time period, Harvard continued to accept mainly wealthy, Protestant applicants who could pay the tuition and meet minimal standards. Harvard filled approximately 75 to 80 percent of the seats with individuals who could afford to pay the full tuition, and fewer than 13 percent of legacy applicants were rejected.

110.    In the late 1940s and early 1950s, following World War II, American public sentiment turned against anti-Semitism, and Harvard began to gradually reduce its discrimination against Jewish applicants.

111.    Harvard, however, retained the admissions policies that it had used to successfully cap Jewish enrollments in the past.

112.    In a 1952 report from the Harvard Committee on Admissions, the Dean of Admissions wrote that Harvard was "one of the few colleges with 'snob' appeal." Accordingly, it attracted the children of the "upper-upper" class throughout the country

24

who were "almost entirely paying guests."  It was possible, he acknowledged, that "a third or half of this group, strictly on their merits in terms of SAT scores, character and personality, was not particularly desirable."  But if Harvard rejected them, it "would lose most of the rest of the group, including a lot of able and desirable students."

113.    Similarly, allegations that Harvard was "dominated by Jews" could cause "students from upper-income, business backgrounds" to abandon Harvard for "colleges like Yale, Princeton, Dartmouth, Williams, etc."

114.    By the 1960s, Harvard was using a complex "docket system" of classifications to process each candidate.

115.    The docket system created 22 groups, ranging from the huge (Docket B, which covered eight Rocky Mountain states) to the very small (Docket P, limited to Boston Latin, and Docket Q, which covered the rest of metropolitan Boston).

116.    The docket system generated "targets" for each docket that proved strikingly close to the actual number of students admitted each year. Each docket was admitted at a different rate.

117.    For example, Docket D (covering the upper Midwest) had about a 25 percent acceptance rate.  By contrast, Docket M ("Select New England private schools") and Docket L ("Exeter and Andover") were admitted at a rate of 44 and 46 percent respectively, compared to just 20 percent for all applicants.

118.    The structure of this system ensured that competition would be almost entirely within rather than between dockets.

119.    The generous targets for some dockets were designed to insulate applicants from competition with other dockets while the restrained targets for others

were intended to guarantee that the number of students admitted would not upset Harvard's delicate "balance."

120.    At this time Harvard also used a second system of classification to rate each applicant individually along four dimensions: personal, academic, extracurricular, and athletic.

121.    The "personal" rating was critical.  According to Harvard's own statistical studies, the personal rating was a stronger predictor of which candidates would ultimately be admitted than the more objective academic rating.   A "4" rating ("generally acceptable") was all but fatal, with a rejection rate of 98 percent; a "1" was a virtual guarantee of admission, with a rejection rate of just 2.5 percent.

122.    Finally, at this time Harvard used a third major scheme to divide applicants into 12 categories.  This "typology," as Harvard called it, was an integral part of each student's file. Each candidate was assigned a code letter that was shorthand for the social type he was thought to embody.

123.    Under this typology, every candidate was placed in one of the following categories:

| 1 | S | First-rate scholar in Harvard departmental terms. |
| 2 | D | Candidate's primary strength is his academic strength, but it doesn't look strong enough to qualify as an S (above). |
| 3 | A | All-American – healthy, uncomplicated athletic strengths and style, perhaps some extracurricular participation, but not combined with top academic credentials. |
| 4 | W | Mr. School – significant extracurricular and perhaps (but not necessarily) athletic participation plus excellent academic record. |
| 5 | X | Cross-country style – steady man who plugs and plugs and plugs, won't quit when most others would.  Gets results largely through stamina and consistent effort. |
| 6 | P | PBH [Phillips Brooks House] style: in activities and personal concerns. |
| 7 | C | Creative in music, art, writing. |
| 8 | B | Boondocker – unsophisticated rural background. |
| 9 | T | Taconic – culturally depressed background, low income. |
| 10 | K | Krunch – main strength is athletic, prospective varsity athlete. |
| 11 | L | Lineage – candidate probably couldn't be admitted without the extra plus of being a Harvard son, a faculty son, or a local boy with ties to the university community. |
| 12 | O | Other – use when none of the above are applicable. |

124.    With only minor modifications, Harvard used this typology through at least 1988, which includes the period when Harvard submitted its description of the "Harvard Plan" to the Supreme Court in its *Bakke amicus* brief.

## V. HARVARD HAS USED AND CONTINUES TO USE AN APPLICANT'S RACE AND ETHNCITY AS A FACTOR IN ADMISSION DECISIONS.

125.    Harvard has long expressly considered the race and ethnicity of applicants in making admissions decisions in ways that go far beyond its systematic discrimination against Jewish applicants.

126.    In 1926, Harvard's Chairman of Admissions, Henry Pennypacker, described how race would be considered under Harvard's new subjective admissions policies: "Race is a part of the record.  It is by no means the whole record and no man will be kept out on grounds of race; but those racial characteristics which make for race isolation will, if they are borne by the individual, be taken into consideration as a part of that individual's characteristics under the test of character, personality and promise.  That if there should result in fact any substantial change in the proportion of groups in the College following application of the test, this will be due, not to race discrimination or any quota system, but to the failure of particular individuals to possess as individuals those evidences of character, personality and promise which weighed with other evidences render them more fit than other individuals to receive all that Harvard has to offer.  Of course there will be criticisms.  It will be said that Harvard is discriminating on grounds of race. That will not be true."

127.    In the early 1960's, Harvard began actively seeking to increase the number of African-American students on its campus.  Notwithstanding this concerted effort, African-American enrollment stagnated until 1968.

128.    In 1968, Harvard altered its admissions policies and practices to admit more African Americans by taking into greater account the limitations of background and schooling that shaped the qualification of many African-American applicants.

129. Under this new policy, an applicant who had "survived the hazards of poverty" and showed that he or she "is clearly intellectually thirsty" and "still has room for more growth" was given an admissions preference.

130. In 1969, one year after this policy change, Harvard's African-American enrollment increased 76 percent over the prior year to 7 percent of the enrolled freshman class. Although Harvard denied that it had instituted a quota, the enrollment rate consistently averaged 7 percent over the next several years.

131. In 1969, a majority of the African-American applicants admitted to Harvard came from socioeconomically challenged backgrounds. By 1973, however, this number had decreased dramatically, with 75 to 80 percent of the African Americans admitted to Harvard coming from backgrounds that did not include "the hazards of poverty."

132. According to Dean Peterson, Harvard diminished its focus on applicants with disadvantaged backgrounds because African Americans from relatively privileged backgrounds allegedly made the transition to Harvard more easily than those from working class and poor backgrounds: "We have learned" that "we cannot accept the victims of social disaster, however deserving of promise they once might have been, or however romantically or emotionally an advocate (or a society) might plead for him."

133. In 1978, Harvard submitted an *amicus* brief to the Supreme Court in *Regents of the University of California v. Bakke* that included a copy of the "Harvard College Admissions Program" as an Appendix.

134. The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* stated that "for the past 30 years the Committee on Admissions" has

"adopted … [t]he belief … that if scholarly excellence were the sole or even predominant criterion, Harvard College would lose a great deal of its vitality and intellectual excellence and that the quality of the educational experience offered to all students would suffer."

135.    The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "The belief that diversity adds an essential ingredient to the educational process has long been a tenet of Harvard College admissions.  Fifteen or twenty years ago, however, diversity meant students from California, New York, and Massachusetts; city dwellers and farm boys; violinists, painters and football players; biologists, historians and classicists; potential stockbrokers, academics and politicians. The result was that very few ethnic or racial minorities attended Harvard College.  In recent years Harvard College has expanded the concept of diversity to include students from disadvantaged economic, racial and ethnic groups.  Harvard College now recruits not only Californians or Louisianans but also blacks and Chicanos and other minority students.  Contemporary conditions in the United States mean that if Harvard College is to continue to offer a first-rate education to its students, minority representation in the undergraduate body cannot be ignored by the Committee on Admissions."

136.    The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "In practice, this new definition of diversity has meant that race has been a factor in some admission decisions.  When the Committee on Admissions reviews the large middle group of applicants who are 'admissible' and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor just as geographic origin or a life spent on a farm may tip the balance in other candidates'

cases.  A farm boy from Idaho can bring something to Harvard College that a Bostonian cannot offer.  Similarly, a black student can usually bring something that a white person cannot offer.  The quality of the educational experience of all the students in Harvard College depends in part on these differences in the background and outlook that students bring with them."

137.  The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated:  "In Harvard College admissions the Committee has not set target-quotas for the number of blacks, or of musicians, football players, physicists or Californians to be admitted in a given year.  At the same time the Committee is aware that if Harvard College is to provide a truly heterogeneous environment that reflects the rich diversity of the United States, it cannot be provided without some attention to numbers.  It would not make sense, for example, to have 10 or 20 students out of 1,100 whose homes are west of the Mississippi.  Comparably, 10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States.  Their small numbers might also create a sense of isolation among the black students themselves and thus make it more difficult for them to develop and achieve their potential.  Consequently, when making its decisions, the Committee on Admissions is aware that there is some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted.  But that awareness does not mean that the Committee sets a minimum number of blacks or of people from west of the Mississippi who are to be admitted.  It means only that in choosing among thousands of applicants who are not only

'admissible' academically but have other strong qualities, the Committee, with a number of criteria in mind, pays some attention to distribution among many types and categories of students."

138.    The "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke* further stated: "The further refinements sometimes required help to illustrate the kind of significance attached to race. The Admissions Committee, with only a few places left to fill, might find itself forced to choose between A, the child of a successful black physician in an academic community with promise of superior academic performance, and B, a black who grew up in an inner-city ghetto of semi-literate parents whose academic achievement was lower, but who had demonstrated energy and leadership, as well as an apparently abiding interest in black power. If a good number of black students much like A, but few like B, had already been admitted, the Committee might prefer B, and vice versa. If C, a white student with extraordinary artistic talent, were also seeking one of the remaining places, his unique quality might give him an edge over both A and B. Thus, the critical criteria are often individual qualities or experience not dependent upon race but sometimes associated with it."

139.    In 2003, Harvard submitted an *amicus* brief to the Supreme Court in *Grutter v. Bollinger*.

140.    The *Grutter amicus* brief stated that Harvard "considers an academically qualified student's race or ethnicity as one among many factors in a carefully designed, competitive admissions process that views each applicant as an individual and weighs the capacity of each to contribute to the class as a whole."

141.     The *Grutter amicus* brief further stated that Harvard seeks "racial and ethnic diversity as a natural part of a long and expanding policy of inclusion" and that it "has been pursuing the idea of student diversity for a period that dates back to the nineteenth century." That includes the period when Harvard was discriminating against Jewish and other disfavored minority groups.

142.     The *Grutter amicus* brief further stated that a racial or ethnic admissions "quota" is "impermissible as an affront to the equal dignity of the excluded" and it defined a "quota" as a "policy that "exclude[s] someone altogether from a given position or opportunity on account of the individual's race."

143.     In 2012, Harvard submitted an *amicus* brief to the Supreme Court in *Fisher v. University of Texas at Austin*.

144.     The *Fisher amicus* brief stated that Harvard has "long used admissions policies similar to the Harvard Plan that Justice Powell approved in [*Bakke*] and the University of Michigan Law School plan upheld in *Grutter*."

145.     The *Fisher amicus* brief further stated that Harvard "consider[s] all aspects of an applicant's background and experience, including in some circumstances the applicant's racial or ethnic background."

146.     The *Fisher amicus* brief further stated that Harvard believes that "racial and ethnic diversity are a distinct kind of difference in background, and reliance on … race-neutral measures alone cannot substitute for individualized, holistic review that takes account of race and ethnicity."

147.    In other words, it is now Harvard's position that race or ethnicity itself—not other factors that may be associated with race or ethnicity—is a distinguishing characteristic that warrants consideration in the admissions process.

## VI.    HARVARD HAS A LONG HISTORY OF INTENTIONALLY DISCRIMINATING SPECIFICALLY AGAINST ASIAN AMERICANS.

148.    Harvard started considering Asian-American students a discrete subset of its undergraduate applicant pool in the early 1970s.

149.    At that juncture, Harvard took the position that Asian Americans students were not "under represented" on its campus and therefore were not in need of "affirmative action."  Harvard nevertheless included Asian Americans in its affirmative-action compliance reports to the Federal government.

150.    Like Jewish applicants, Asian-American applicants tended to have superior academic records, and were well represented among the most successful students.

151.    Harvard came to the conclusion that Asian Americans were "over-represented" in its student body.

152.    According to Henry Rosovsky, Harvard's Dean of the Faculty of Arts and Sciences (and later Acting President), Asian-American students were "no doubt the most over-represented group in the university."

153.    In 1974, a group calling itself the Coalition of Asian Americans ("CAA") formed at Harvard.  For at least two years, Harvard refused to recognize the CAA as a minority student organization.

154.    In 1976, Harvard continued to refuse to recognize Asian Americans as a minority and barred those Asian Americans that had accepted admission to the college from participating in its Freshman Minority Orientation.

155.    By 1977, the CAA had become the Asian-American Association ("AAA").    The AAA demanded, among other things, that Harvard expand Asian-American recruitment and include Asian Americans within the college's "affirmative action" program.

156.    Between 1976 and 1978, the proportion of Asian Americans increased from 3.6 percent to 6.5 percent of the freshman class—a result of the successful mobilization of Asian-American students at Harvard.    These events coincided with a massive increase in Asian Americans applying to Harvard for undergraduate admission.

157.    Despite these increases, Harvard held Asian Americans to a higher standard than other applicants.

158.    In 1983, Margaret Chin, a Harvard undergraduate who had worked in the college's admissions office, co-authored a report entitled "Admissions Impossible." Surveying data from 25 universities, the report found that while Asian-American applications to Harvard and other universities were soaring, enrollments were barely increasing.

159.    Although Harvard claimed that the lower admission rate for Asian-American applicants was attributable to weaker academic qualifications, the "Admissions Impossible" report found that, on average, Asian Americans were *more* qualified than other applicants and that Harvard had set an informal ceiling on Asian-American enrollment.

160.   In the wake of this report, Harvard abandoned the argument that Asian-American applicants had weaker qualifications.  Former Dean of Admissions Fred Jewett instead claimed, on behalf of Harvard, that "arguments over numbers ignore a whole range of personal qualities," and that Harvard's official policy favored "choosing people who bring talents underrepresented in the applicant pool."

161.   In 1987, a study found that Asian-American students admitted to Harvard had an average SAT score of 1467, whereas white students admitted to Harvard had an average SAT score of 1355—a 112-point difference.

162.   In a 1987 *New York Times* article, Berkeley professor Ling-Chi Wang compared the way Asian Americans are considered in college admissions to the earlier treatment of Jews: "I think all of the elite universities in America suddenly realized they had what used to be called a 'Jewish problem' before World War II, and they began to look for ways of slowing down the admissions of Asians."  Robert Lindsey, *Colleges Accused of Bias to Stem Asians' Gains*, New York Times (Jan. 19, 1987).

163.   In 1988, Harvard rejected Ling-Chi Wang's claim of discrimination against Asian-American applicants just as it had rejected the "Admissions Impossible" study's findings of discrimination.  Dean of Admissions William Fitzsimmons—who remains Dean of Admissions today—acknowledged that "Asian Americans are slightly stronger than whites on academic criteria," but blamed the disparity in admissions on Asian Americans, as a group, being "slightly less strong on extracurricular criteria."

164.   In July 1988, the Office of Civil Rights ("OCR") of the U.S. Department of Education began investigating the treatment of Asian-American applicants at Harvard to determine whether Harvard was engaging in discrimination in violation of Title VI of the

Civil Rights Act.  However, the investigation was strictly limited to the treatment of Asian-American applicants as compared to white applicants.

165.   The OCR investigation lasted more than two years.  Under the pressure of the investigation, Harvard began to increase its enrollment of Asian Americans.  By the end of the investigation, the percentage of Asian Americans admitted to Harvard increased from 10.8 percent in 1988 to 16.1 percent in 1991.

166.   OCR announced its findings in October 1990.  Focusing on ten groups admitted from 1979 through 1988, it found that Asian Americans had been admitted at a significantly lower rate for each of the past seven years, even though they were "similarly qualified" to white applicants.  OCR nevertheless blamed the differential on legacy preferences and found that the differential admission rates were not the product of racial or ethnic discrimination.

167.   The OCR report was roundly criticized.  According to Harvard Law Professor Alan Dershowitz, for example, Harvard's rationale was just pretext for intentional discrimination: "Asian Americans clearly get a big whack—not a tip—in the direction against them.  Harvard wants a student body that possesses a certain racial balance…. I think the report was sloppy.  I have absolutely no faith in the Harvard system of admissions."

## VII.   HARVARD'S CURRENT DISCRIMINATORY ADMISSIONS PLAN

### A.   Harvard's Stated Admissions Goals.

168.   On its website, Harvard states as follows: "In our admissions process, we give careful, individual attention to each applicant.  We seek to identify students who will

be the best educators of one another and their professors—individuals who will inspire those around them during their College years and beyond."

169.    The Harvard website further states that Harvard "asks [itself] many questions" about an applicant for admission, which generally fall under four categories: an applicant's "growth and potential," "interests and activities," "character and personality," and "contribution to the Harvard community."

170.    The Harvard website further states that, in assessing an applicant's "growth and potential, the committee asks questions such as "Have you reached your maximum academic and personal potential" and "Do you have initiative?" and "What sort of human being are you now?"

171.    The Harvard website further states that, in assessing an applicant's "interests and activities," the committee asks questions such as "Do you care deeply about anything—intellectual? Extracurricular? Personal?" and "What have you learned from your interests?" and "In terms of extracurricular, athletic, community, or family commitments, have you taken full advantage of opportunities?"

172.    The Harvard website further states that, in assessing "character and personality," the committee asks questions such as "What choices have you made for yourself?" and "Are you a late bloomer?" and "What about your maturity, character, leadership, self-confidence, warmth of personality, sense of humor, energy, concern for others, and grace under pressure?"

173.    The Harvard website further states, in assessing an applicant's "contribution to the Harvard community," the committee asks questions such as "Will you be able to stand up to the pressures and freedoms of College life?" and "Will you

contribute something to Harvard and to your classmates?" and "Would other students want to room with you, share a meal, be in a seminar together, be teammates, or collaborate in a closely knit extracurricular group?"

174. The Harvard website further states that its admissions process "strives to be deliberate, meticulous and fair" while acknowledging that the process "permits extraordinary flexibility and the possibility of changing decisions virtually until the day the Admissions Committee mails them."

**B.** **Harvard's Admissions Process.**

1. The Application.

175. During an admissions cycle, the Harvard Admissions Committee reviews each student's admissions materials. Those materials include: (1) the Common Application or Universal College Application, including an essay, and the required parts of the Harvard Supplement; (2) the high school transcript, school report, and mid-year school report—all submitted by a student's guidance counselor; (3) standardized test scores—submitted by the College Board; (4) teacher and guidance counselor recommendations; (5) optional on-campus and/or off-campus interviewer evaluation; (6) optional personal statements (found on the Harvard Supplement) in addition to the required essays; and (7) optional music tapes, artwork slides, or samples of academic work.

176. Harvard gathers information about the race and ethnicity of its applicants through numerous ways.

177. An applicant filling out a Common Application has the option of disclosing his or her racial identity.

178. The Common Application asks two questions to identify an applicant's race and ethnicity: (1) "Are you Hispanic/Latino?" and (2) "Regardless of your answer to the prior question, please indicate how you identify yourself. (Check one or more and describe your background.) American Indian or Alaska Native (including all Original Peoples of the Americas); Asian (including Indian subcontinent and Philippines); Black or African American (including Africa and Caribbean); Native Hawaiian or Other Pacific Islander (Original People); or White (including Middle Eastern)."

179. The Common Application requires applicants to identify their parents' first and last name, the parents' former last names, and their country of birth.

180. Similarly, the Universal College Application gives the applicant the option of disclosing his or her racial identity.

181. The Universal College Application asks two questions to identify an applicant's race and ethnicity: "Are you Hispanic or Latino?" and "How would you describe your racial background? (select one or more of the following categories): Asian ([if so, identify] country of family origin); Black or African American; American Indian or Alaska Native ([if so, identify where] enrolled [and] Tribal affiliation; Native Hawaiian or Other Pacific Islander; or White."

182. The Universal College Application requires applicants to identify their parents' first and last names.

183. The Universal College Application also requires applicants to identify, if it is not English, the "language spoken in your home."

184. Harvard also encourages students to emphasize their race and ethnicity through their essays. According to Monica Del Toro, a Harvard Admissions Officer, the

essay "is the most important part of the application." The biggest rule, she says, "is to stand out," and a good way "to truly stand out from the rest of the pack is to discuss your culture."

185. Harvard accepts transfer students who have completed at least one continuous academic year in a full-time degree program at one college.

186. Harvard evaluates applicants for transfer in the same purportedly "holistic" manner it evaluates all other applicants. Harvard uses race or ethnicity as a factor in evaluating transfer applicants.

2. <u>The Review Process.</u>

187. Students are admitted through one of four lists: (1) early admissions; (2) regular admissions; (3) the waitlist; or (4) the "Z-list." A student accepted through the early admission process must accept Harvard's offer of admission.

188. As the admissions materials are received at the admissions office, they are stamped, dated, sorted, and organized in a folder, called the "file," along with a scorecard, called the "reading sheet," which is used to evaluate the applicant's eligibility for admission.

189. Admissions officers start by assessing each applicant in four areas (academics, extracurriculars, personal qualities, and athletics) on a scale of one (best) to six (worst).

190. Those who pass this initial threshold move forward to a second and sometimes third reader for further appraisal; the rest form the first batch of rejections, their folders marked with notes such as "below the edge" or "case falls flat."

191.   Small teams of admissions officers, each responsible for one of the 25 or so geographic regions or "dockets" into which Harvard divides its applicants, then scrutinize the remaining applicants for as long as five days.

192.   After the docket reader has looked through and graded the file on the reading sheet, the folder is passed on to two more readers, who examine and evaluate all materials on separate reading sheets.  The information from the three reading sheets is compiled onto a final reading sheet.  Once this sheet has been prepared for all applicants in the docket, the admissions committee convenes to discuss the eligibility of all applicants from that docket.

193.   Between 5,000 and 7,000 applicants proceed to the last and most contentious stage, the full committee meeting, in which all 35 admissions officers debate and vote on who will make the final cut.  The committee's decisions are ultimately rendered by simple majority ballot.

194.   Typically, more students are voted in than space will permit.  So the final portion of the process is spent in "reruns," in which candidates who had won approval have their initial acceptances rescinded.

195.    After reruns, a final decision is made either to accept, reject, wait-list, or "Z-list" the applicant.

196.    Harvard considers race and/or ethnicity as a factor in whether to accept, reject, wait-list, or "Z-list" an applicant.

197.    Applicants who are waitlisted are reviewed again by Harvard admissions officials in May after the admissions office has received students' updated class grades, test scores, and achievements.

198.    Those select students placed on the "Z-list" are admitted on the condition that they take a mandatory year off before enrolling in Harvard.  Harvard uses the Z-list to admit legacies and children of affluent families and elite schools who cannot gain admission through the ordinary course.

199.    Harvard does not reveal publicly any aspect of its deliberative or decisional admissions process other than the end result.

## VIII. HARVARD CURRENTLY ENGAGES IN INTENTIONAL DISCRIMINATION AGAINST ASIAN-AMERICAN APPLICANTS.

200.    Harvard intentionally discriminates against Asian-American applicants.  This discrimination is shown through both direct and circumstantial evidence, including statistical studies of Harvard's admissions decisions.  These studies confirm what Asian-American applicants and their parents already know: Harvard intentionally and artificially limits the number of Asian Americans to whom it will offer admission.

### A.    There Is Decisive Statistical Evidence That Harvard Discriminates Against Asian-American Applicants.

201.     Each year, Harvard publishes a significant amount of data concerning its application process.  Among other things, Harvard releases admitted student data and enrolled student data broken down by racial category.

202.    Harvard used to allow the public to examine admission rates by race as well.  More recently, however, Harvard began keeping these figures secret.  Harvard has never offered an explanation for this decision.

203.    By contrast, the prestigious University of California system routinely releases information about its applicant pool broken down by racial category, which allows the public to examine admission rates by race.

204.    Nonetheless, significant data regarding Harvard's applicant pool has been made publicly available.

205.    This statistical evidence establishes that Harvard is intentionally discriminating against Asian Americans by making it far more difficult for Asian Americans than for any other racial and ethnic group of students to gain admission to Harvard.

206.    Princeton professor Thomas J. Espenshade and his coauthor, Alexandra Radford, conducted an authoritative study of the role of race in elite American undergraduate admissions for their book *No Longer Separate, Not Yet Equal*, which was published in 2009.  Espenshade and Radford gathered exhaustive application data on a group of three elite public and four elite private colleges.

207.    Controlling for a wide variety of academic, demographic, and personal characteristics, Espenshade and Radford found that Asian-American students were dramatically less likely to be admitted than otherwise similar students who identified themselves as white or Caucasian.  In fact, Espenshade and Radford's analysis showed that the negative odds-ratio affecting Asian Americans relative to Whites was larger than the positive odds-ratio affecting African Americans relative to Whites.

208.    The Espenshade-Radford study also expressed the admissions penalty facing Asian Americans in terms of SAT-point equivalents.  The authors reported that Asian Americans needed SAT scores that were about 140 points higher than white students, all other quantifiable variables being equal, to get into elite schools.  Thus, if a white student needed a 1320 SAT score to be admitted to one of these schools, an Asian American needed a 1460 SAT score to be admitted.  That is a massive penalty given that

marginal differences in SAT scores are magnified among those students competing for admission to the most elite universities, as there is less room at the very top of the SAT scale to differentiate between applicants.

209.    Recent statistical evidence reveals that discrimination against Asian Americans at Harvard is even more severe than the Espenshade-Radford study found.

210.    In recent years, *The Harvard Crimson* has been surveying incoming freshmen.  In 2013, nearly 80% of the incoming class of 2017 responded to its survey. According to the survey, the average SAT of respondents was 2237 (on a 2400-scale), while the average SAT of individual ethnic groups varied widely: 2299 for East Asians and Indians, 2107 for African-Americans, and 2142 for Native Americans).  Given this reporting, the average SAT for non-Hispanic Whites is at or somewhat below the overall median.

211.    This class average (2237) corresponds to roughly the 99.5 percentile of the SAT, meaning that Harvard draws half of its class from students scoring in the top 1/2 of 1 percent of the SAT I distribution.  The "East Asian and Indian" average of 2299 corresponds to the 99.9 percentile of the SAT, meaning that Harvard draws about half of this ethnic group from the top 1/10 of 1 percent of the SAT I distribution.  That is a dramatically higher standard of academic performance.  Harvard requires much more of its Asian-American applicants than it requires of other races and ethnicities.

212.    Dr. Richard Sander, a professor of law at UCLA, and Medha Uppala, a graduate student in statistics at UCLA, recently co-authored a working paper titled *The Evolution of SES Diversity in the Applicant Pool of Highly Selective Universities, 1994-2012*.  In this working paper, Dr. Sander and Ms. Uppala examine data on several Ivy

League colleges that shed valuable light on the admissions practices at these schools. The paper examines the degree to which elite colleges, including Harvard, have expanded their access in recent years to students with low socioeconomic status. The primary data source is a widely used database from the College Board, which biannually compiles anonymized data on 100,000 SAT-takers nationwide. The paper reveals startling application patterns from the aggregated data that it reports, which, in conjunction with other data sources, make manifest Harvard's massive intentional discrimination against Asian Americans.

213. As an initial matter, the paper finds that Asian Americans are being admitted to these schools at a far lower rate than the rate at which they apply. The paper notes that for "three of the most selective Ivy League colleges," the average racial makeup of all domestic score senders between 2008 and 2012 is 27.3 percent Asian American, 11.3 percent African American, 12.5 percent Hispanic, 40.4 percent non-Hispanic White, and 8.5 percent other race or non-identified. Over this same time period, however, Asian Americans represented only 17-20 percent of the admitted students. No other racial or ethnic group at these schools is as underrepresented relative to its application numbers as are Asian Americans. Indeed, no other racial or ethnic group comes even remotely close to this level of underrepresentation.

214. Thus, if Harvard admitted randomly from its applicant pool, the number of Asian Americans in its entering freshman class would be far higher than it actually is.

215. These data alone provide strong evidence that Harvard is engaging in intentional discrimination against Asian-American applicants absent some factor that makes this gross disparity explainable on non-discriminatory grounds.

216.     Moreover, the paper's data shows that Asian-American applicants have, on average, stronger qualifications for admission than any other racial or ethnic group applying to top Ivy League schools.

217.     Ironically, then, the most *underrepresented* group of admitted students relative to the applicant pool is the most *overrepresented* racial or ethnic group among top academic performers.

218.     Among "three of the most selective Ivy League colleges," the paper's data shows that, during the 2008, 2010, and 2012 admissions cycles, Asian Americans, on average, constituted nearly 39 percent of all domestic SAT-takers who (a) had scores of 2100 or higher and (b) sent their scores to these schools.

219.     *The Harvard Crimson* survey, as does every other available public source, confirms that the vast majority of Harvard's students come from this pool of applicants (with SAT scores of 2100 or higher).

220.     Remarkably, students with higher test scores were even more likely to be Asian Americans.  In 2008, Asian Americans made up 46 percent of domestic Harvard score-senders with SAT scores above 2200 (a range from which Harvard draws more than half of its students).   In addition, Asian Americans made up an even higher percentage of the very top students; they accounted for 55 percent of domestic Harvard score-senders with SAT scores above 2300.  These patterns are very similar across all of the top Ivy League schools.  In 2008-12, for the three Ivy League schools analyzed by Dr. Sander and Ms. Uppala, Asian Americans made up 38.9 percent of all domestic score-senders with SAT scores above 2100; 45 percent of domestic score-senders with SAT scores above 2200; and over 51 percent of domestic score-senders with SAT scores

above 2300.  These data, in combination with other publicly available data, demonstrate that Asian Americans admitted to Harvard are vastly underrepresented—by a factor of half or even two-thirds—relative to the number of applications from Asian Americans that Harvard receives.

221.    There is no reason to doubt that Harvard is one of the three Ivy League colleges in Dr. Sander's and Ms. Uppala's analysis.  Harvard is among the most selective colleges in the Ivy League (if not the most selective).  But even if Harvard is not one of the colleges they examined, its patterns of Asian-American enrollment and selectivity closely match those of the "three of the most selective Ivy League colleges" in Dr. Sander's and Ms. Uppala's analysis such that there is no reason to believe their conclusions would not apply to Harvard.

222.    In all events, Harvard's data is highly consistent with *all* other Ivy League schools, which as Table A shows, inexplicably enroll Asian Americans in remarkably similar numbers year after year after year.

| School | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| **Table A** | | | | | | | |
| **Ivy League Enrollment (Asian Americans)** | | | | | | | |
| **Brown** | 15% | 16% | 15% | 15% | 14% | 12% | 14% |
| **Columbia** | 17% | 17% | 16% | 16% | 16% | 16% | 18% |
| **Cornell** | 16% | 17% | 17% | 16% | 16% | 16% | 16% |
| **Dartmouth** | 14% | 14% | 15% | 15% | 14% | 14% | 14% |
| **Harvard** | 15% | 17% | 17% | 16% | 17% | 18% | 18% |
| **Penn** | 17% | 17% | 18% | 18% | 18% | 18% | 18% |
| **Princeton** | 14% | 15% | 16% | 17% | 18% | 19% | 17% |
| **Yale** | 14% | 14% | 15% | 15% | 15% | 16% | 16% |

223.    Various additional studies confirm that Harvard is intentionally discriminating against Asian-American applicants and that it is doing so in much the same manner as it discriminated against Jewish applicants decades ago.

224.    In 2012, Ron Unz, who holds an undergraduate physics degree from Harvard and studied theoretical physics at Stanford, conducted an extensive study of Ivy League admissions.  *See* Ron Unz, *The Myth of American Meritocracy*, American Spectator (Dec. 2012).  Mr. Unz found rampant discrimination against Asian Americans by Ivy League universities generally and Harvard specifically.

225.    Using data from the National Center for Educational Statistics, as well as other sources, Mr. Unz found that the "ethnic composition of Harvard's undergraduates … follows a highly intriguing pattern."  In particular, he found that after seeing a steady increase in Asian-American admissions through the 1980s and into the 1990s, in 1993 "Asian numbers went into reverse, generally stagnating in the two decades that followed, with the official 2011 figure being 17.2 percent."

49

226.   Unz found "[e]ven more surprising … the sheer constancy of these percentages, with almost every year from 1995-2011 showing an Asian enrollment within a single point of the 16.5 percent average, despite high fluctuations in the numbers of applications and the inevitable uncertainty surrounding which students will accept admission."   Unz highlighted that "this exactly replicates the historical pattern … in which Jewish enrollment rose very rapidly, leading to the imposition of an informal quota system, after which the numbers fell substantially, and thereafter remained roughly constant for decades."

227.   A report by the Consortium on Financing Higher Education, in the Harvard Class of 1995, also showed that Asian Americans are held to a higher standard than any other group of applicants. *See* Melissa Lee, *Report Discloses SATs, Admit Rate*, The Harvard Crimson (May 7, 1993).   Responding to this study, Dean Fitzsimmons stated that race is "only one factor in deciding whether a candidate is admitted," but that certain minority groups, particularly African Americans, are "highly sought after" and that, "[s]tatistically, one could make the argument that it's easier for certain minorities [to be admitted]."

228.   Dean Fitzsimmons added: "It's true that admission rates for Asian Americans and whites are lower than the admission rates for Hispanics and African American students and Native American students as well.   But it's more complicated than that. . . . The question we look at is how much more likely will white and Asian American students have access to the kind of preparation that will make one an outstanding college candidate here."

229.    No non-discriminatory factor justifies the gross disparity in Asian American admissions relative to their presence in Harvard's applicant pool.

230.    One non-discriminatory factor that theoretically could justify this gross disparity would be if a disproportionally high percentage of Asian-American students were clustered at the low end of the applicant pool with regard to academic qualifications as compared to other racial groups. But as Dr. Sander's and Ms. Uppala's paper and other data show, the opposite is in fact true. A disproportionally high percentage of Asian-American students are clustered at the high end of the applicant pool with regard to academic qualifications.

231.    Another non-discriminatory factor that theoretically could justify this gross disparity would be if a disproportionally high percentage of Asian-American students were lacking with regard to non-academic criteria as compared to other racial groups.

232.    But there is no data to support that theory. *See, e.g.*, Esteban M. Aucejo, Hanming Fang, and Ken Spenner, "Does Affirmative Action Lead to Mismatch? A New Test and Evidence," 2 Quantitative Economics 303 (2011). This study found no racial advantage for underrepresented minority applicants in levels of personal achievement.

233.    Studies also have shown that high-achieving Asian-American students are equally, if not more, qualified than other racial groups with regard to non-academic criteria. At the University of California, Los Angeles (UCLA), over several years, undergraduate admissions readers assigned each applicant three types of scores: "academic achievement" (principally high school grades, AP courses, and standardized test scores); "life challenges" (mainly socioeconomic background); and "personal

achievement" (such as leadership, musical ability, and community service). These three scores jointly determined virtually all admissions decisions. *See* Peter Arcidiacono, Thomas Espenshade, Stacy Hawkins, and Richard Sander, *A Conversation on the Nature, Effects, and Future of Affirmative Action in Higher Education Admissions*, Pennsylvania Journal of Constitutional Law (Fall 2014).

234. The data cover over 100,000 undergraduate applicants to UCLA over three years and show absolutely no correlation between race and "personal achievement." Rather, the data show that the only strong predictor of personal-achievement scores is academic achievement; applicants with high test scores and grades tended to have personal achievement scores that were about one standard deviation higher than applicants with low test scores and grades.

235. There is no evidence that Asian Americans applying to UCLA have personal achievement credentials that Asian Americans applying to Harvard uniformly lack. Rather, all available evidence points in the opposite direction.

236. Moreover, notwithstanding Harvard's public relations emphasis on non-academic factors in reviewing applications, academic performance is the principal criteria for admission—except when it comes to minority groups that are either preferred or discriminated against based on their race and ethnicity.

237. Academic analyses of dozens of application processes at colleges and law schools around the country demonstrate that selective schools give far more weight to academic achievement and preparation than to other types of accomplishment and activity. *See* Richard Sander, *Why Strict Scrutiny Requires Transparency: The Practical*

*Effects of Bakke, Gratz, and Grutter* (2011). In general, academic factors alone explain about 80 percent of admissions decisions at selective schools.

238. The gross disparity between the percentage of Asian-American students in the applicant pool and those in the admitted pool therefore are not explainable on any grounds other than intentional discrimination on the basis of race.

**B.** **Elite Schools That Use Race-Neutral Admissions Have Far Higher Asian-American Enrollment**.

239. Other elite colleges and universities do not consider race in their admissions process, and therefore serve as controls against which to measure Harvard's admission and enrollment figures. Those universities uniformly admit and enroll far higher percentages of Asian American students than Harvard.

240. For example, the California Institute of Technology (Caltech) is a private school that selects its students by strict academic standards and chooses not to consider race. Almost 40 percent of its undergraduates are Asian American.

241. Table B sets forth the Asian-American percentage of the total undergraduate enrollment at Caltech and Harvard:

| Table B Asian-American Enrollment | | |
|---|---|---|
| | **Harvard** | **Caltech** |
| **1992** | 19.1% | 25.2% |
| **1993** | 20.6% | 26.9% |
| **1994** | 18.3% | 29.8% |
| **1995** | 18.4% | 29.1% |
| **1996** | 17.5% | 27.6% |
| **1997** | 17.4% | 27.4% |
| **1998** | 17.0% | 24.1% |
| **1999** | 17.2% | 24.3% |
| **2000** | 17.1% | 24.9% |
| **2001** | 16.4% | 24.5% |
| **2002** | 16.3% | 27.2% |
| **2003** | 16.2% | 31.1% |
| **2004** | 17.1% | 31.1% |
| **2005** | 17.6% | 33.0% |
| **2006** | 14.3% | 37.4% |
| **2007** | 15.4% | 38.1% |
| **2008** | 16.7% | 39.8% |
| **2009** | 17.0% | 39.9% |
| **2010** | 15.6% | 39.4% |
| **2011** | 17.2% | 38.8% |
| **2012** | 17.7% | 39.6% |
| **2013** | 18.0% | 42.5% |

242. The following graph represents the Asian-American enrollment trends between the two schools:



243.    The University of California system also does not use racial preferences, as they were banned via popular referendum in 1996.  Asian Americans currently make up 34.8 percent of UCLA's student body and 32.4 percent of the University of California at Berkley's student body.

244.    A similar phenomenon exists at elite high schools.  Those high schools that do not employ racial preferences have extraordinarily high percentages of Asian Americans.  For example, Hunter College High School in New York chooses students without giving preference to legacies, athletes, or underrepresented minorities.  This admissions system produced a student body that was 49 percent Asian American in 2013.

245.    Similarly, Thomas Jefferson High School for Science and Technology, a magnet school in Virginia that is consistently ranked one of the best high schools in the country, does not employ racial preferences.  Its 2014 entering fall class is 66 percent Asian American.

## C.     Statements By Admissions Staff At Harvard And Other Schools Provide Further Evidence That Harvard Discriminates Against Asian-American Applicants.

246.    Harvard evaluators consistently rank Asian-American candidates below White candidates in "personal qualities."   In comments written in applicants' files, Harvard admissions staff repeatedly have described Asian Americans as "being quiet/shy, science/math oriented, and hard workers."

247.    One Harvard official summed up the profile of a purportedly typical Asian applicant this way: "He's quiet and, of course, wants to be a doctor."

248.    Another Harvard official wrote that an applicant's "scores and application seem so typical of other Asian applications I've read: extraordinarily gifted in math with the opposite extreme in English."

249.    According to Hunter College High School's director of college counseling, admissions officers at elite universities often complain that Asian American applicants all look the same on paper.  "When Harvard calls us back and gives us a brief synopsis of why certain [Asian] kids didn't make it, they'll say, 'There were so many kids in the pool that looked just like this kid.'"

250.    Admissions officers at other top schools have expressed similar sentiments. For example, asked why Vanderbilt poured resources into recruiting Jewish students instead of Asian Americans, a former administrator said, "Asians are very good students, but they don't provide the kind of intellectual environment that Jewish students provide."

251.    Rod Bugarin, a former admissions officer at Wesleyan, Brown, and Columbia, stated: "The bar is different for every group.   Anyone who works in the

industry knows that." Without affirmative action, "our elite campuses will look like UCLA and Berkeley," and "[t]hat wouldn't be good for Asians or for anyone else."

> **D.** **College Counselors Acknowledge Discrimination Against Asian Americans At Elite Universities**.

252. College counselors and advisors recognize that discrimination against Asian Americans occurs at elite universities such as Harvard and thus tell Asian Americans to hide their identity, to emphasize personal characteristics that avoid Asian stereotypes, and, in many cases, to lower their expectations and apply elsewhere.

253. For example, the Princeton Review, the leading guide to college admissions, gives specific recommendations for Asian-American students applying to elite schools such as Harvard on how to overcome these schools' anti-Asian-American bias. Its recommendations are both honest and discouraging.

254. According to the Princeton Review: "Asian Americans comprise an increasing proportion of college students nationwide. Many Asian Americans have been extraordinarily successful academically, to the point where some colleges now worry that there are 'too many' Asian Americans on their campuses. Being an Asian American can now actually be a distinct disadvantage in the admissions processes at some of the most selective schools in the country. Increasingly, the standard for affirmative action isn't minority status, but under-represented minority status. Since Asian American populations at many colleges exceed the proportion of Asian Americans to the population of the state or country as a whole, Asian Americans are a minority, but not an under-represented minority, at those colleges…. If you are an Asian American—or even if you simply have an Asian or Asian-sounding surname—you need to be careful about what you do and don't say in your application."

255.    According to the Princeton Review: "You need to avoid being an Asian Joe Bloggs.  Asian Joe Bloggs is an Asian American applicant with a very high math SAT score, a low or mediocre verbal SAT score, high math- or science-related SAT II scores, high math and science grades, few credits in the humanities, few extracurricular activities, an intended major in math or the sciences, and an ambition to be a doctor, an engineer, or a research scientist.  The more you sound like this person, the more likely admissions officers will be to treat you as part of the 'Asian invasion' and reject your application, or at the very least make you compete against other Asian applicants with similar characteristics, rather than against the applicant pool as a whole."

256.    Princeton Review further explains: "If you share traits with Asian Joe Bloggs you should probably pay careful attention to the following guidelines:

- If you're given an option, don't attach a photograph to your application and don't answer the optional question about your ethnic background.  This is especially important if you don't have an Asian-sounding surname.  (By the same token, if you do have an Asian-sounding surname but aren't Asian, do attach a photograph.)

- Work on your verbal SAT score, take some literature and history courses, and get involved in activities other than math club, chess club, and computer club.

- Do not write your application essay about the importance of your family or the positive/negative aspects of living in two cultures.  These are Asian Joe Bloggs topics, and they are incredibly popular.  Instead, write about something entirely unrelated to your ethnic background.

- Don't say you want to be a doctor, and don't say you want to major in math or the sciences.  You don't have to lie.  If you have lousy SAT verbal scores, saying you want to be an English major isn't going to help you, either. Just say you're undecided.  The point is to distance yourself as much as possible from the stereotype.

- These guidelines are less important if you are chiefly interested in less selective schools or if you are applying to schools where all the students take only math and science courses and dream of medical or

research careers. In fact, Asian Joe Bloggs's high math and science scores can be an advantage in applying to schools below the Ivy league level. Even there, though, the less you sound like the stereotype, the better your chances will be."

257. Whole new industries have sprung up to help Asian Americans overcome discrimination and secure admission to elite universities, including Harvard.

258. One organization called "Asian Advantage College Consulting" promises to help an "Asian-American student applying to elite colleges beat the Asian Quotas." Its strategy is, first, recognizing that "Asian students need to approach the admissions process in a completely different manner than the white or non-Asian applicant" and, second, developing a strategy to stand out from the many "Asian-American applicants with high grades and SAT/ACT scores, along with a seemingly impressive list of awards and achievements in science fairs, musical competitions and school-based activities like debate and the robotics club."

259. Similarly, the Ivy League Coach, a college counseling practice, provides specific recommendations for Asian Americans: "The fact is, highly selective colleges seek a diverse incoming class and a diverse incoming class does not mean an all Asian class. So Asian students do indeed compete against each other. Does that mean that an Asian American student shouldn't check off 'Asian American' on their college application? Not necessarily. A student should check off the ethnicity that they're most comfortable with, the ethnicity or ethnicities that they most closely identify with. But what the article on Asians and college admissions … doesn't say is that college admissions counselors are going to suspect that Henry Chang is Asian whether or not Henry Chang checks the box. But that doesn't mean Henry can't do something about differentiating himself from other Asian American applicants…. Don't just be the math

kid with perfect scores who competes in Mathletes.  Don't just play the violin.  Do something that many of the Asian American kids in your class aren't doing…. Whether or not the following is [politically correct], it's also true: What you want to do is distinguish yourself from any perceived stereotypes."

260.  The bias against Asian-American applicants discussed by these college counselors exists at Harvard.  Many high school guidance counselors caution students applying to Harvard not to list their race as Asian.

261.  According to one high school guidance counselor, Asian Americans face difficulty because they cannot distinguish themselves within their community: "[e]very single child has had music lessons.  Every single child succeeds well in math.  Every single child has done community service in a hospital. Every child has done Chinese or Korean studies on Saturday and is fluent in that language."

### E.  Asian-American Applicants And Their Families Know That They Are Being Discriminated Against By Elite Universities.

262.  Asian Americans are not blind to the discrimination employed by Harvard and other elite colleges and universities.

263.  According to Princeton economist Uwe Reinhardt, "within the Asian community, of which I'm a part, there's this feeling that, for you to get into Harvard or Princeton, you've got to be better than everybody else."

264.  According to Kara Miller, a former Ivy League admissions officer, "Asian kids know that when you look at the average SAT for the school, they need to add 50 or 100 to it.  If you're Asian, that's what you'll need to get in."

265.  For example, Iris Wang, a senior at Hunter College High School, one of the best public high schools in America, scored a 1520 SAT score and had top grades.  Her

father is a chemist and her mother a postal worker. She was rejected by Harvard, as well as numerous other schools. According to Wang, "All the schools basically say, 'we don't discriminate.' But I went to the Columbia session and they said they value a multicultural community. If they want to be multicultural, there's only so many of one culture they can take."

266. Daniel Golden, the Pulitzer Prize-winning reporter then of *The Wall Street Journal*, described Jamie Lee, who applied to Harvard, as well as six other elite private schools: According to Mr. Golden, "Jamie Lee was a superb student. Born in Hong Kong to an English father and Chinese mother, he grew up in London, where teachers marveled at his ability and his IQ was measured at 162, widely considered genius level. When his family emigrated to Greenwich, Connecticut, in 2003, he quickly established himself as a top student at Greenwich High, a premier public school. On his first tries, without a test-prep course, he scored the maximum on the PSAT, the SAT, and two of his three SAT II subject tests; on the third SAT II, writing, he missed by only 20 points, scoring 780 out of 800. Nor was he merely a standardized-test machine; his problem solving displayed impressive originality. In 2005, Jamie won the Greenwich High award given to the senior who 'demonstrates creative ability and inventiveness in math, who may take the unusual approach to a problem and come up with an unexpected answer.' His creativity also emerged in music (the high school string ensemble performed his composition 'Three Dances,' with Jamie on cello) and mechanical design (he built an ingenious wooden cabinet with doors that automatically opened and closed a mobile rack for storing compact discs). 'He likes to be opposition and play the devil's advocate,' said his junior-year Latin teacher, Camille Fusco. 'He's very independent in his thinking. On

an essay question, he'd deliberately take the point of view I didn't want to hear. But he

got away with it because he can take any view brilliantly.'"

267. Despite this academic record, Harvard—as well as Princeton, Yale,

Stanford, Columbia, Dartmouth, and MIT—denied Jamie Lee admission. Fusco said he

"'was really shocked [Jamie] didn't get in" because he "'thought of him as a Harvard

person.'"

268. Jamie's English literature teacher, Brigid Barry, said she too was "'very,

very surprised. There's no doubt he's an outstanding student,'" and that in eight years of

teaching AP English, she had seen the Ivy League schools admit many weaker

candidates.

269. Marlyn McGrath Lewis, Harvard's director of admissions, told Jamie's

father that Jamie "'was an excellent student but that a number of better musicians had

applied.'" When asked later if Jamie was held to a higher standard because he was half

Asian, Ms. Lewis declined to comment.

270. One strategy that Asian-American students applying to Harvard use is to

avoid identifying their race. Many Asian-American students are unwilling to state their

race at all on college applications.

271. For example, Lanya Olmstead was born in Florida to a mother who

immigrated from Taiwan and an American father of Norwegian ancestry. Ethnically, she

considers herself half Taiwanese and half Norwegian. But when applying to Harvard,

Olmstead checked only one box for her race: white. According to Olmstead: "I didn't

want to put 'Asian' down ... because my mom told me there's discrimination against

Asians in the application process…. Not to really generalize, but a lot of Asians, they have perfect SATs, perfect GPAs, … so it's hard to let them all in."

272.   Said another student: "As someone who was applying with relatively strong scores, I didn't want to be grouped into that stereotype … I didn't want to be written off as one of the 1.4 billion Asians that were applying."

273.   Applicants who are part Asian American regularly attempt to conceal their Asian ancestry when applying to Harvard out of concern it would greatly reduce their chances of admission.

274.   For example, Harvard student Heather Pickerell, born in Hong Kong to a Taiwanese mother and American father, refused to check any race box on her application because "I figured it might help my chances of getting in."

275.   According to Lee Cheng, founder of the Asian American Legal Foundation, "Many Chinese-American children have internalized their anger and pain, confused about why they are treated differently from their non-Chinese friends.  Often they become ashamed of their ethnic heritage after concluding that their unfair denial is a form of punishment for doing something wrong."

276.   Another example is Henry Park.  According to Daniel Golden's reporting: "Henry Park ranked 14th out of 79 members of the class of 1998 at Groton School, a super competitive prep school in Groton, Massachusetts.  He got a perfect 800 on the math SAT for a combined score of 1560 out of 1600, placing him in the top one-quarter of 1 percent of college-bound students.  On the SAT II subject test, he scored another perfect 800 on the harder of the two math exams offered, along with 760 out of 800 in Latin and 740 in physics.  He played violin and competed on the cross-country team, and

a respected math journal published a paper he coauthored with two classmates. And as the son of hardworking, middle-class Korean immigrants who dreamed of a better life for their children and scrimped to pay Groton's tuition, Henry seemed to embody the up-by-his bootstraps American saga that is supposed to appeal to college admissions officers."

277. Henry's guidance counselor at Groton nevertheless discouraged him from applying to the Ivy League, telling him "it was a long shot at best, and advised him to lower his expectations to second- and third-tier schools."

278. Harvard denied Henry admission, as did Yale, Brown, and Columbia. At the same time, Ivy League universities admitted 34 of Henry's Groton classmates. According to Henry: "When the decisions came out, and all these people started getting in, I was a little upset. I feel I have to hold myself to a higher standard." Added his mother, Suki Park, "I was naïve. I thought college admissions had something to do with academics."

279. Henry Park's mother described the harm caused to Henry and his family: "I have thought many, many times why Henry failed. It was just devastating. He just failed like a falling leaf…. Korean Americans have to do a lot better than Caucasians to get admitted, and it's probably the same for other Asians. It's very, very tough. Presently, yes, there is discrimination."

280. When MIT's dean of admissions Marillee Jones was asked about Henry Park, who was rejected by Harvard, she said that "it's possible that Henry Park looked like a thousand other Korean kids with the exact same profile of grades and activities and temperament. My guess is that he just wasn't involved or interesting enough to surface to

the top."  To Ms. Jones, it made sense for universities to admit other students over "yet another textureless math grind."

281.  The "model minority" stereotype of high-achieving Asian Americans does an even greater disservice to socioeconomically disadvantaged individuals by making it virtually impossible for disadvantaged Asian Americans to compete with disadvantaged students from other races who are held to a lower standard.

282.  For example, Kai Chan, a Princeton doctoral student in economics and the son of Chinese immigrants, describes the struggles he has endured: "Is it fair in the name of (skin-deep) diversity to hold back qualified students from admission to the Ivies because of their race?   After all, it is a fact that Asians need higher academic achievements than their peers to get admitted to the same school…   The misguided approach of programs like affirmative action can be seen through my experience.  I am the son of poor, non-English speaking parents, neither of whom attended high school. They never read to me as a child.  They never attended my graduations.  I went to some terrible high schools.  (Altogether, I attended five high schools, one of which was known locally as 'last chance high.')  I worked practically full-time while attending high school and college. But I've never gotten the benefit of the doubt anytime in my life.   If anything, I've had to be better than my peers."

283.  Application statistics confirm that Asian Americans are aware of (and have responded to) the discrimination they suffer at Harvard.   As the Asian-American population of the United States has grown, so has its share of academically high-achieving students.  As Dr. Sander's paper shows, Asian Americans made up roughly 21 percent of all domestic SAT takers with scores above 1400 in the 1994, 1996, and 1998

admissions cycles. In the 2008, 2010, and 2012 admissions cycles, Asian Americans made up roughly 33 percent of all domestic SAT takers with scores above 2100—an increase roughly proportionate to the growth of the Asian-American proportion of all SAT takers.

284. Yet during this same period, as many elite colleges, including Harvard, increasingly discriminated against Asian Americans, the proportion of high-scoring Asian Americans sending their scores to these schools declined sharply. As Dr. Sander and Ms. Uppala report, the proportion of Asian Americans with top SAT scores (i.e., above 1400 in 1994-98 and 2100 in 2008-12) who sent their scores to the most selective Ivy League schools fell from 39.7 percent in the mid-1990s to only 27.4 percent during the 2008, 2010, and 2012 cycles. No comparable drop occurred for any other racial group.

285. Asian Americans understand that they are not competing for admission to Harvard against the entire applicant pool. In light of Harvard's discriminatory admissions policies, they are competing only against each other, and all other racial and ethnic groups are insulated from competing against high-achieving Asian Americans.

286. Because Asian Americans congregate at the high end of Harvard's applicant pool, the competition is fierce. This has deterred and continues to deter many qualified Asian Americans from applying to Harvard. Harvard's discriminatory reach thus extends far beyond those highly qualified Asian Americans who decide to apply and whose applications are treated unfairly in the admissions process.

287. This discrimination has reached and continues to reach every Asian American student who has shied away or will shy away from applying to Harvard out of

the well-founded fear that he or she will not successfully make it out of the highly competitive Asian American admissions pool and gain admission to Harvard.

## IX.    HARVARD CURRENTLY ENGAGES IN RACIAL BALANCING.

288.    Not only does Harvard discriminate against Asian Americans, it racially balances its entering freshman class to ensure proportional representation of the various racial and ethnic groups present in Harvard's student body.

289.    Harvard's system of racial balancing is shown through both direct and circumstantial evidence, including statistical studies of Harvard's admissions decisions. This evidence confirms that Harvard is not using racial preference to pursue "critical mass" or any other diversity goal the Supreme Court has ever found permissible.

290.    As shown in Table C, the racial demographics of Harvard's admitted class have remained stable across all racial groups at least over the last 9 years.

| Table C | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Harvard Admissions (Percentage of Admitted Students by Race/Ethnicity) | | | | | | | | | |
| | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 |
| **African American** | 11.9% | 11.5% | 10.2% | 11.8% | 11.3% | 10.8% | 11.0% | 10.7% | 10.5% |
| **Hispanic** | 13.0% | 11.5% | 11.2% | 12.1% | 10.3% | 10.9% | 9.7% | 10.1% | 9.8% |
| **Asian American** | 19.7% | 19.9% | 20.7% | 17.8% | 18.2% | 17.6% | 18.5% | 19.6% | 17.7% |
| **Native American** | 1.9% | 2.2% | 1.7% | 1.9% | 2.7% | 1.3% | 1.3% | 1.5% | 1.4% |
| **White and Other** | 53.5% | 54.9% | 56.2% | 56.4% | 57.5% | 59.4% | 59.5% | 58.1% | 60.6% |

291.    As shown in Table D, the racial demographics of Harvard's enrolled first-year classes also have remained stable across all racial groups throughout the past decade.

| Table D<br>Harvard Enrollment (Percentage of First Years by Race/Ethnicity) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2013** | **2012** | **2011** | **2010** | **2009** | **2008** | **2007** | **2006** | **2005** | **2004** | **2003** |
| **Nonresident alien** | 11% | 11% | 12% | 10% | 10% | 10% | 10% | 9% | 9% | 9% | 8% |
| **Hispanic/Latino** | 10% | 9% | 10% | 9% | 9% | 7% | 8% | 8% | 7% | 9% | 8% |
| **American Indian or Alaska Native** | 0% | 0% | 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| **Asian Americans** | 19% | 20% | 17% | 15% | 17% | 19% | 18% | 15% | 19% | 20% | 17% |
| **Black or African American** | 7% | 6% | 7% | 6% | 9% | 8% | 8% | 8% | 9% | 9% | 9% |
| **Native Hawaiian or Other Pacific Islander** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **White** | 43% | 45% | 45% | 44% | 40% | 41% | 42% | 44% | 47% | 47% | 50% |
| **Two or more races** | 7% | 6% | 6% | 6% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **Race and ethnicity unknown** | 3% | 3% | 3% | 11% | 14% | 15% | 13% | 15% | 8% | 5% | 7% |

292.    As shown in Table E, the racial demographics of Harvard's overall student body likewise have remained remarkably stable across all racial groups throughout the past decade.

| **Table E** **Harvard Enrollment (Percentage of Student Body)** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2013** | **2012** | **2011** | **2010** | **2009** | **2008** | **2007** | **2006** | **2005** | **2004** | **2003** |
| **Nonresident alien** | 11% | 11% | 11% | 10% | 10% | 10% | 9% | 10% | 8% | 8% | 7% |
| **Hispanic/Latino** | 9% | 9% | 9% | 8% | 8% | 7% | 7% | 7% | 7% | 8% | 7% |
| **American Indian or Alaska Native** | 0% | 0% | 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| **Asian Americans** | 18% | 18% | 17% | 16% | 17% | 17% | 15% | 17% | 18% | 17% | 16% |
| **Black or African American** | 6% | 6% | 7% | 7% | 8% | 8% | 8% | 8% | 8% | 8% | 7% |
| **Native Hawaiian or Other Pacific Islander** | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **White** | 45% | 45% | 45% | 44% | 42% | 45% | 46% | 45% | 49% | 49% | 49% |
| **Two or more races** | 6% | 5% | 5% | 3% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **Race and ethnicity unknown** | 4% | 5% | 6% | 12% | 14% | 14% | 14% | 14% | 8% | 9% | 12% |

293.    Table C, Table D, and Table E, both individually and collectively, demonstrate that Harvard is engaging in racial balancing as there can be no non-discriminatory reason justifying such remarkable stability in its overall student body across all racial groups over this multi-year period.

294.    Indeed, Harvard's admissions and enrollment data tends to demonstrate that Harvard is engaging in racial balancing to a statistically significant degree.

295.    The year-to-year changes in the racial composition of Harvard's admitted and enrolled freshman class also reflect racial balancing as shown by, among other things, how Harvard has managed its balance between African Americans and Hispanics, and how it has managed its balance between Asians and Non-Hispanic whites.

296.    Over the period between 1994 and 2008, African American enrollment has remained extraordinarily stable at Harvard, averaging 7.8 percent with a standard deviation (calculated by year over the 14-year period) of 0.3 percent.  Hispanic enrollment also remained quite stable, averaging 7.4 percent with a standard deviation of 0.4 percent.  This occurred despite the fact that throughout this period, the applicant pool of academically strong Hispanic students at Harvard and other elite Ivy League schools was substantially larger than the similar pool for African Americans, and the gap became larger over time.

297.    Yet Harvard and its peer Ivy League colleges have consistently admitted as many African Americans as Hispanics (if not more), even though this meant using substantially larger preferences for African Americans than for Hispanics.  In other words, Harvard has manipulated the size of racial preferences to ensure it maintained racial balance.

298.    Over the period between 2003 and 2012, the percentage of Asian Americans at Harvard wavered only slightly above and below approximately 17 percent. As noted earlier, this is despite the fact that, by 2008, Asian Americans made up over 27 percent of Harvard's applicant pool, and approximately 46 percent of applicants with academic credentials in the range from which Harvard admits the overwhelming majority of students.  But during this same period, Harvard's "non-Hispanic white" representation is only slightly declining.

299.    Given Harvard's other racial balancing goals, it is obvious that if Harvard evaluated Asian Americans and non-Hispanic whites equally, non-Hispanic white admissions would drop significantly, possibly to the point where Asian-American

enrollment and non-Hispanic white enrollment would be roughly comparable. Although this would cause Harvard's overall level of racial diversity to increase, not decrease, Harvard nevertheless continues to use racial balancing to keep white enrollment more than twice as high as Asian-American enrollment.

300.     The minor year-to-year deviations in admissions and enrollment numbers demonstrate Harvard's commitment to maintaining racial stability over any four-year enrollment period. In other words, when enrollment of a particular racial or ethnic group exceeds or falls short of Harvard's intended goal, in the next one or two admissions cycles, Harvard admits fewer or more applicants of that racial or ethnic group in order to balance out the overall student body.

301.     For example, in 2005, 18 percent of Harvard's student body was Asian American, which was a 16-year high. In response, Harvard admitted an unusually low number of Asian Americans in the following admissions cycle (17.7 percent). That predictably resulted in an unusually low yield of Asian Americans enrolling at Harvard (15.0 percent). Indeed, both the 2006 admissions and enrollment figures for Asian Americans were at or near 10-year lows.

302.     Similarly, in 2012, 6 percent of Harvard's overall student body was African American, which was a 24-year low. In response, Harvard admitted an unusually high number of African Americans in the next two admissions cycle (11.5 percent and 11.9 percent, respectively), which were both record highs. That predictably resulted in an usually high yield of African Americans enrolling at Harvard in 2013, which maintained an overall enrollment figure in line with the 20-year average, and would be expected to result in a similar enrollment level of African Americans in 2014.

303.    No factor or criteria for admission—other than racial balancing—could explain these admissions patterns and the overall consistency of Harvard's admissions, enrollment, and overall student body figures across all racial groups.

304.    As the Unz study found, "ethnic enrolment levels which widely diverge from academic performance data or applications rates and which remain remarkably static over time provide obvious circumstantial evidence for at least a *de facto* quota system."

## X.  HARVARD HAS AVAILABLE RACE-NEUTRAL ALTERNATIVES THAT CAN ACHIEVE STUDENT-BODY DIVERSITY.

305.    Harvard has a host of race-neutral alternatives that can achieve student body diversity without the use of racial classifications, including but not limited to: (a) increased utilization of non-race-based preferences; (b) increased use of financial aid, scholarships, and recruitment to attract and enroll minority applicants; and (c) elimination of admissions policies and practices that operate to the disadvantage of minority applicants.   Furthermore, eliminating racial preferences at Harvard will alleviate the substantial harm these discriminatory policies cause to those minority applicants who receive such admissions preference, the Harvard community, and society as a whole.

### A.  **Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions By Making Greater Use Of Non-Racial Preferences.**

306.    Colleges and universities that have eliminated race-based admissions have maintained or increased their student body diversity by placing greater emphasis on socioeconomic factors, which often strongly correlate with an applicant's race but are not exclusively reserved for applicants of a particular race or ethnicity.  Using socioeconomic

preferences thus increases racial diversity *and* achieves the broader diversity that Harvard claims to seek by opening the door of opportunity for poor students of all races.

307.    In a recent study of ten leading public universities that ended race-based preferences, researchers found that seven of these schools maintained or increased their enrollment of African-American and Hispanic students by adopting strategies that target socioeconomic inequality.  *See* Halley Potter, *Transitioning to Race-Neutral Admissions: An Overview of Experiences in States Where Affirmative Action Has Been Banned*, The Future of Affirmative Action (2014).

308.    For example, the University of Colorado has devised an admissions formula that gives a significant preference to students from socioeconomically disadvantaged backgrounds.  This refined formula takes into consideration numerous socioeconomic factors, including single-parent status, parents' education level, family income, native language, the number of dependents in the family, whether the applicant attended a rural high school, the percentage of students from the applicant's high school eligible for free or reduced-price lunch, the school-wide student-to-teacher ratio, and the size of the twelfth-grade class.

309.    Under this admissions program, the University of Colorado found not only that the socioeconomic diversity of its incoming class increased substantially, but that racial and ethnic diversity increased as well.  African-American and Hispanic acceptance rates to the University of Colorado increased from 56 percent under race-based admissions to 65 percent under class-based admissions.  *See* Matthew N. Gaertner, *Advancing College Access with Class-Based Affirmative Action*, The Future of Affirmative Action (2014).

310.     Recently, a national simulation was conducted to determine whether the use of socioeconomic preferences could achieve student body diversity without the use of racial preferences at elite universities.  *See* Anthony P. Carnevale, Stephen J. Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014).  The study simulated various admissions models at the top-rated 193 colleges and universities "because the dialogue about affirmative action often implies that it is access to these schools and the opportunities they provide in business, social and career advancement that truly matters."  The study examined, among other things, the effect of substituting socioeconomic preference for race-based preferences at America's elite college and universities using test scores and high-school grades as measures of merit.

311.     The national simulation ultimately found that "it is possible to achieve both racial and economic diversity in selective colleges without using race per se as an admissions criterion" and, importantly, that it could be achieved consistent with the understanding "that affirmative action models ought to promote racial diversity as an educational benefit instead of promoting racial diversity for its own sake."

312.     Another study found that increased focus on parental education and wealth—as opposed to income—as a measure of socioeconomic status also can help achieve student body diversity without the use of racial preferences.  *See* Dalton Conley, *The Why, What, and How of Class-Based Admissions Policy*, The Future of Affirmative Action (2014).  The study found that "the most important factor in predicting individual academic success is the education of a parent" and the "economic factor" that mattered most was "parental net worth (that is, wealth) and not income."  Indeed, "wealth

conceptually captures the legacy of historical inequalities of opportunity better than aspects of class that cannot be literally transferred directly from one generation to the next by signing a check (or a deed or a will)."  While African Americans make on the order of 60 to 70 percent of what whites make in income, the median African-American family wealth is just 10 percent of white family wealth.

313.    Affording a community-based preference is another means of achieving student body diversity by admitting more socioeconomically disadvantaged students.  *See* Sheryll Cashin, *Place not Race: A New Vision of Opportunity in America* (2014). African Americans and Hispanics are much more likely to live in neighborhoods with concentrated poverty than whites.  *See* John R. Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics, and Asians in Metropolitan America* (2011), Table 2.

314.    Universities have used this community-based homogeneity to promote racial and ethnic diversity through race-neutral means.  For example, Texas, California, and Florida have adopted "percent plans" that guarantee admission to state universities for top graduates (based on grades) from each high school in the state.  These percentage plans have been successful in promoting community, socioeconomic, and racial diversity.

315.    In addition to statewide percentage plans, a university can achieve student body diversity by granting a preference within their existing admissions framework utilizing other community-based metrics, such as an applicant's zip code.  *See* Danielle Allen, *Talent is Everywhere: Using Zip Codes and Merit to Enhance Diversity*, The Future of Affirmative Action (2014).

316.    Studies show that students admitted based on socioeconomic as opposed to racial criteria regularly outperform all other admitted students.  These students drop out at lower rates, graduate in shorter time periods, and receive better grades.

317.    The Espenshade-Radford study found that selective private institutions use racial preferences that are two to three times as large as their socioeconomic preferences.

318.    This failure to give weight to socioeconomic preferences is exemplified by Harvard, particularly given the lack of socioeconomic diversity in the student body as compared to racial diversity.

319.    Measured in terms of those students receiving federal Pell Grants, which are awarded to students coming from low-income families, Harvard lags far behind other schools. The percentage of students at Harvard who receive Pell Grants has ranged in recent years from 11 percent to 19 percent.  In comparison, universities that employ race-neutral admissions had far greater numbers of Pell Grant recipients, including UCLA (35 percent), UC Berkeley (33 percent), and the University of Florida (30 percent). *2014 National Universities Rankings – Social Mobility*, Washington Monthly (2014).

320.    According to a survey of the 2014 freshman class that *The Harvard Crimson* conducted, 14 percent reported annual family income above $500,000 and another 15 percent came from families making more than $250,000 per year.  In contrast, only 20 percent reported incomes less than $65,000.  Taking these statistics at face value, they show that a high school student from the top "1 percent" of the income distribution is approximately 35 times more likely to attend Harvard than one from the bottom 50 percent.

321.     According to former Harvard president Lawrence Summers, only ten percent of students at selective colleges and universities, including Harvard, come from the bottom half of the income scale.  *See* Harvard University President Lawrence H. Summers Commencement Address (2004).

322.     By contrast, Harvard places far greater weight on an applicant's race—regardless of his or her socioeconomic status or the community of origin.

323.     By increasing the weight given to an applicant's socioeconomic status and/or community of origin, Harvard could achieve student body diversity without resorting to the disfavored tool of racial preferences.

**B.**     **Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions By Making Greater Use Of Financial Aid And Scholarships To Attract Minority Candidates.**

324.     Relying on socioeconomic instead of racial preferences at the admissions stage is the first step.  But Harvard needs to ensure that those underprivileged minorities that benefit from socioeconomic preferences are in a position to accept the offer of admission and enroll at Harvard.  To that end, Harvard can achieve student body diversity by increasing its use of financial aid and scholarships.

325.     Colleges and universities that have eliminated racial preferences have maintained or increased student body diversity by offering more financial aid to socioeconomically disadvantaged students.  For example, the University of California system, which does not use race-based preferences, covers system-wide tuition for students from families with incomes below $80,000.  The University of California devotes one-third of tuition revenue to financial aid.

326.     Harvard, in contrast, only covers the tuition of students from families with incomes below $65,000.  This is a trivial use of Harvard's vast economic resources.

Harvard's $36.4 billion endowment is the largest in the nation; it exceeds the gross domestic product of over 100 nations. Yet it costs students $43,938 per year in tuition alone, and $58,607 overall per year, to attend Harvard.

327. Harvard has the economic resources to increase the coverage of full tuition far beyond the current $65,000 threshold. Doing so would make it possible for underprivileged minorities, especially those in the lower middle class and those who may have slightly higher income levels but less wealth, admitted to Harvard through the increased use of socioeconomic preferences (as opposed to affluent minorities currently admitted due to racial preferences) to be in a position to accept an offer of admission and enroll at Harvard.

### C. Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions Through Increased Recruitment And Other Steps Designed To Encourage More Qualified Minority Students To Apply For Admission.

328. Harvard can achieve student body diversity by bringing more highly qualified, socioeconomically disadvantaged minorities into its applicant pool.

329. Across the country, there are tens of thousands of high-achieving, socioeconomically disadvantaged minorities who fail to apply to selective schools, including Harvard, at which they would likely be admitted and at which they would enroll if offered sufficient financial aid.

330. One study found that between 25,000 and 35,000 socioeconomically disadvantaged high school seniors obtain an SAT or ACT in the 90th percentile or higher and have a GPA of A- or better. Nearly 6 percent of this group is African American and nearly 8 percent is Hispanic. A great many of these socioeconomically disadvantaged students "undermatch" by applying to and enrolling at colleges and universities less

selective than the ones to which they could have been admitted. *See* Caroline Hoxby, Christopher Avery, *The Missing "One-Offs": The Hidden Supply of High-Achieving, Low-Income Students*, Brookings Papers on Economic Activity (Spring 2013).

331.    The "undermatch" problem is a serious issue in the Ivy League. Among the highly selective Ivy League schools studied by Dr. Sander and Ms. Uppala, the applicant pools of these schools included, on average, less than 20 percent of the socioeconomically disadvantaged students in the country with SAT scores above 2100. The rate is even lower for high-scoring, socioeconomically disadvantaged Asian Americans, in which less than 18 percent of such students are, on average, in the applicant pools of the highly selective Ivy League schools.

332.    Universities with race-neutral admissions have increased their student body diversity by improving recruitment of these socioeconomically disadvantaged, high-achieving minority students. For example, after race-based admissions were eliminated in Texas, the University of Texas at Austin increased its student body diversity by implementing numerous programs designed to recruit students from underrepresented regions and high schools, including "Longhorn Game Weekends," which focus on specific geographic regions, and "Longhorn for a Day," which reaches out to students in underrepresented high schools.

333.    Furthermore, a study found that simply mailing a well-designed, targeted brochure to high-achieving, socioeconomically disadvantaged students could be instrumental in causing them to apply to selective colleges and universities. *See* Sheryll Cashin, *Place not Race: A New Vision of Opportunity in America* 49 (2014).

334. Universities also have achieved student body diversity by aggressively recruiting high-achieving community college students, who are more likely to be African American or Hispanic. For example, in 1997, after California banned racial preferences, the University of California substantially increased its recruitment and enrollment of community college students. As a result of the University of California's efforts, by 2012, about 29 percent of new students enrolling in the University of California system were transfers from community colleges. *See Preparing California for Its Future: Enhancing Community College Student Transfer to the University of California* (2014).

335. Harvard does little to recruit high-achieving, socioeconomically disadvantaged minority students or high-achieving community college students.

336. Harvard focuses its recruitment in parts of the country with small numbers of socioeconomically disadvantaged achievers and neglects regions with a significant number of such students. For example, Harvard recruits heavily in New England, which has only 3.5 percent of low-income high achievers nationwide, yet neglects Midwest and Rocky Mountain states, which produce 21.2 percent of these students.

337. This failure to recruit socioeconomically disadvantaged students is reflected in Harvard's applicant pool. Although there are more than 10,000 high schools in the country that have students with the credentials to be admitted to Harvard, only a small fraction of these schools have students who ultimately apply to Harvard.

338. In addition, community college transfer students are a miniscule percentage of Harvard's student body. Each year, Harvard accepts fewer than three students from community colleges across the country.

339.    Harvard officials have flatly conceded that they make little effort to recruit students from community colleges and other nontraditional educational backgrounds. *See* Arianna Markel, *Harvard Lags in Community College Recruitment*, The Harvard Crimson (Dec. 12, 2007).

340.    Harvard could achieve its student body diversity without the use of racial preferences by improving its recruitment of socioeconomically disadvantaged, high-achieving minorities, and community college students.

### D.    Harvard Can Achieve Student Body Diversity Without Using Race As A Factor In Admissions Decisions Through The Elimination Of Admissions Policies And Practices That Harm Minority Applicants.

341.    Harvard employs a series of admissions practices and policies that make it more difficult for socioeconomically disadvantaged minorities to gain admission. Eliminating these practices and policies would allow Harvard to achieve student body diversity without using racial preferences.

342.    Harvard grants an admissions preference to "legacy" applicants.

343.    The acceptance rate for legacy applicants to Harvard is about 30 percent, which is roughly five times the rate at which all other applicants are admitted to Harvard.

344.    At most universities throughout the country, including Harvard, alumni children are less likely to be socioeconomically disadvantaged or racial minorities than the rest of the student body.  Thus, colleges and universities, like Harvard, that grant admissions preferences to legacies give a competitive advantage to mainly white, wealthy applicants, while undermining the chances for admission of socioeconomically disadvantaged and minority applicants.  *See* John Brittain and Eric L. Bloom, *Admitting the Truth: The Effect of Affirmative Action, Legacy Preferences, and the Meritocratic*

*Ideal on Students of Color in College Admissions*, Affirmative Action for the Rich (2010).

345.    As a consequence, eliminating legacy preferences in conjunction with other race-neutral admissions policies can achieve student body diversity.  Several universities, including Texas A&M University, the University of Georgia, and the University of California, have increased their student body diversity by ending their practice of favoring legacies in the admissions process in conjunction with the elimination of racial preferences.

346.    Furthermore, one study found that eliminating legacy preferences in combination with other race-neutral admissions criteria could more than double African-American and Hispanic enrollment and more than triple the enrollment of socioeconomically disadvantaged students.  *See* Anthony P. Carnevale, Stephen J. Rose, Jeff Strohl, *Achieving Racial and Economic Diversity with Race-Blind Admissions Policy*, The Future of Affirmative Action (2014).

347.    Harvard can achieve student body diversity without using racial preferences by eliminating legacy admissions preferences in conjunction with other race-neutral measures.

348.    Eliminating legacy preferences is a workable race-neutral strategy. Research finds that the existence of legacy preferences does not increase alumni donations to an institution.  *See* Chad Coffman, Tara O'Neil, and Brian Starr, *An Empirical Analysis of Legacy Preferences on Alumni Giving at Top Universities*, Affirmative Action for the Rich (2010).

349.     Harvard also grants admissions preferences to non-legacy students whose parents make significant donations to Harvard, notwithstanding its $36.4 billion endowment.

350.     For example, a wealthy New Jersey real estate developer who did not attend Harvard pledged $2.5 million to Harvard in 1998.  That same year, his son applied to Harvard, even though he did not take demanding classes in high school and his test scores were below Ivy League standards.  His son's high school advisors were "surprised when he applied to Harvard—and dismayed when he was admitted."

351.     As one of his advisors explained, "[t]here was no way anybody in the administrative office of the school thought he would on the merits get into Harvard.  His GPA did not warrant it, his SAT scores did not warrant it.  We thought for sure, there was no way this was going to happen.  Then, lo and behold, [he] was accepted.  It was a little bit disappointing because there were at the time other kids we thought should really get in on the merits, and they did not."

352.     Minority students are far less likely to be children of wealthy donors.  Thus, colleges and universities, like Harvard, that grant admissions preferences to children of wealthy donors give a competitive advantage to mainly white applicants while undermining the chances for admission of minority applicants.

353.     Harvard's preferences for legacies and children of wealthy donors often operate in tandem to the detriment of minority applicants.  For example, one applicant, who was a fifth-generation Harvard legacy, scored 1440 on her SATs, which is below Harvard's average, and ranked in the second quartile her high school class.  Before she applied to Harvard, her father donated $1 million to the university and pledged an

additional $5 million in future years. Shortly after her junior year, the applicant's father arranged for her to meet the Dean of Admissions, William Fitzsimmons. She was admitted to Harvard the following year.

354. When asked whether it was fair that she was admitted, she stated that legacy preferences are a "valid thing for a college to do. Any college has to be careful about the students it lets in from a social perspective. If you let in too many of any one group, it can affect social cohesiveness. At one time, Harvard had too many Asian American students…. It's important to Harvard to have people who know what it means to work hard, make good friends, and go out at night. A lot more alumni children are well-rounded kids, probably because they come from more stable families."

355. Harvard can achieve student body diversity without using racial preferences by eliminating admissions preferences for children of wealthy donors, both legacies and non-legacies, in conjunction with other race-neutral measures.

356. Harvard also operates a unique form of admissions known as the "Z-list." The Z-list is an admissions process under which Harvard admits a select group of students on the condition that they take a year off before enrolling in Harvard.

357. Harvard admits between 20 and 50 students through the Z-list every year.

358. Harvard principally uses the Z-list to admit legacies and children of affluent families who cannot gain admission through the ordinary course and who can afford to take a year off before enrolling in college.

359. In 2010, *The Harvard Crimson* interviewed 28 students admitted under the Z-list. Of these students, 18 were children of Harvard alumni and all but four received no financial aid from Harvard.

360.    Students admitted through the Z-list are overwhelmingly wealthy and white, and have a worse academic record than the rest of the student body.

361.    For example, in 2006, Harvard used the Z-list to admit the granddaughter of a Harvard alumnus who had endowed a professorship in computer science, even though she had inferior admissions credentials.  By contrast, one of her high school classmates, Jennifer Soo Hoo, who is of Chinese descent, had comparatively outstanding credentials: she was a Cum Laude Society member, an Advance Placement Scholar, a National Merit Scholar, an all-conference center back on the soccer team, and scored a 34 out of 36 on the ACT.  Jennifer was rejected by every Ivy League school to which she applied.

362.    Harvard can achieve student body diversity without using racial preferences by eliminating Z-list admissions in conjunction with other race-neutral measures.

363.    Finally, Harvard admits applicants through an early admission program. Early admissions is a practice in which schools allow students to submit their application in the early Fall if they apply to only one school or promise to attend the school if admitted.

364.    Early admission programs, like Harvard's program, usually benefit wealthier and better-informed students because these students have the resources to submit their application early and do not need to hold out for the prospect of financial aid.  *See* Justin Pope, *Harvard Drops Early Admissions, Saying They Favor Wealthier Students Over Minorities, Poor*, Associated Press (Sept. 12, 2006).

365.    By contrast, socioeconomically disadvantaged students and minorities face a disadvantage under early admission programs because they often receive inadequate information and counseling and lack the economic resources to commit to a school so early in the process.

366.    Because early admissions undermine the chances of socioeconomically disadvantaged and minority applicants, in 2006, Harvard terminated this program. According to Harvard's then-President Derek Bok, "We think this will produce a fairer process because the existing process has been shown to advantage those who are already advantaged."

367.    Similarly, Dean of Admissions William Fitzsimmons supported ending early admissions because "[t]here are lots of very talented students out there from poor and moderate-income backgrounds who have been discouraged by this whole hocus-pocus of early admissions."

368.    Harvard reinstated early admissions in 2011.  The reintroduction of early admissions has again hurt the ability of socioeconomically disadvantaged and minority students to apply and be admitted to Harvard.

369.    Harvard can achieve student body diversity without using racial preferences by eliminating its early admission program in conjunction with other race-neutral measures.

**E.    Achieving Student Body Diversity Through Race-Neutral Means Eliminates The Heavy Cost Imposed By The Use Of Racial Preferences.**

370.    Any assessment of the feasibility of race-neutral alternatives must also take into account the heavy costs of *not* employing them.  The costs of continuing to use

racial preferences, when workable race-neutral alternatives exist, are high from both a legal and a practical perspective.

371. As a legal matter, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2418 (2013) (citations and quotations omitted).

372. As a result, the Fourteenth Amendment, and therefore Title VI, "forbids the use even of narrowly drawn racial classifications except as a last resort." *Croson*, 488 U.S. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

373. Harvard's practice of labeling all applicants according to broad racial categories illustrates why such classifications are pernicious and always create the "danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics." *Croson*, 488 U.S. at 493.

374. These racial categories lump together students in categories such as "African American" or "Hispanic" or "Asian American," even though they come from vastly different cultures, experiences, and backgrounds.

375. For example, Harvard's category of "Asian Americans" comprises roughly 60 percent of the world's population, including individuals of Chinese, Japanese, Korean, Vietnamese, Cambodian, Hmong, and Indian descent.

376. While many Asian Americans have been in the United States for generations, others are recent immigrants or children of immigrants. Some Asian Americans came to the United States to escape communism, authoritarianism, war, and

poverty, while others simply sought out greater opportunities. Some Asian Americans come from highly educated families, but many others do not.

377.    Asian Americans also have a wide range of religious beliefs, including Christianity, Islam, Buddhism, Judaism, Hinduism and many others. Some come from cultures that aggressively promote education, while many others come from cultures that take a less demanding approach.

378.    Thus, for example, Indian-American students are different from Japanese-American students; Vietnamese-American students are different from Chinese-American students; and students from Mainland China, Hong Kong, and Taiwan all have unique perspectives and cultural experiences.

379.    Given this diversity, it is lamentable for Harvard to lump all Asian Americans together in the admissions process. Yet this categorization is the inevitable byproduct of using group-based racial classifications instead of employing race-neutral alternatives that are able to account for the vast differences among applicants.

380.    Racial classifications also have a stigmatizing effect on the supposed beneficiaries of these policies. Irrespective of whether an individual African-American or Hispanic applicant is admitted to Harvard because of a racial preference, so long as racial preferences exist, it will often be assumed that race is the reason for the applicant's admission to the school. This stigma can have a devastating effect on the psyche of impressionable students.

381.    For example, according to one African American who attended an elite liberal arts college, upon arriving at school, "I was immediately stereotyped and put into a box because I was African-American. And that made it harder to perform. . . . There

was a general feeling that all blacks on campus were there either because they were athletes or they came through a minority-recruitment program and might not really belong there." Shaken by the experience, the student dropped out after his freshman year.

382. Harvard can eliminate the harmful effects these unfair stereotypes cause by using race-neutral alternatives.

383. Finally, the "mismatch effect" of racial preferences far too frequently put the supposed beneficiaries of race-based admissions policies in a position where they cannot succeed academically in order to fulfill the university's social-engineering vision.

384. This "mismatch" effect happens when a school employs such a large admissions preference that the student is academically damaged in a variety of ways by being placed in an academic environment where most of the student's peers have substantially stronger levels of academic preparation.

385. For example, a student who would flourish at a less elite school instead finds himself or herself at Harvard, where the professors are not teaching at a pace designed for him or her. Instead, they are teaching to the "middle" of the class, introducing terms and concepts at a speed that is unnerving even to the best-prepared student.

386. The student who is underprepared relative to others in that class falls behind from the start and becomes increasingly lost as the professor and classmates race ahead. The student's grades on his or her first exams or papers put him or her at the bottom of the class. Worse, the experience may well induce panic and self-doubt,

making learning even more difficult, thus creating a vicious cycle that only exacerbates the problem.

387.    The "mismatch effect" has been documented in dozens of studies.  *See, e.g.*, Peter Arcidiacono, Esteban M. Aucejo, and Ken Spenner, *What Happens After Enrollment? An Analysis of the Time Path of Racial Differences in GPA and Major Choice* (2011); U.S. Commission on Civil Rights, *Encouraging Minority Students to Pursue Science, Technology, Engineering and Math Careers, Briefing Report* (October 2010); Richard Sander and Roger Bolus, *Do Credential Gaps in College Reduce the Number of Minority Science Graduates?* (2009); Richard Sander, *A Systemic Analysis of Affirmative Action in American Law Schools*, 57 Stan. L. Rev. 367 (2004); Stephen Cole and Elinor Barber, *Increasing Faculty Diversity* (2003); Rogers Elliott, A. Christopher Strenta, Russell Adair, Michael Matier and Jannah Scott, *The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions,* 37 Research in Higher Education 681 (1996).

388.    As this research demonstrates, African-American college freshmen are more likely to aspire to science or engineering careers than are white freshmen, but mismatch causes African Americans to abandon these fields at twice the rate of whites.

389.    As a consequence, African Americans who start college interested in pursuing a doctorate and an academic career are twice as likely to be derailed from this path if they attend a school where they are mismatched.

390.    Furthermore, about half of African-American college students rank in the bottom 20 percent of their classes.

391.    Mismatch also creates social problems on campus. The academic research shows that interracial friendships are more likely to form among students with relatively similar levels of academic preparation; thus, African Americans and Hispanics are more socially integrated on campuses where they are less academically mismatched.

392.    Harvard has and is continuing to experience the problems associated with the "mismatch" effect as documented in major, unrebutted empirical studies that either included Harvard or included studies of close peer institutions.

393.    "Academic mismatch" has been documented at Harvard by sociologists Stephen Cole and Elinor Barber. *See* Stephen Cole and Elinor Barber, *Increasing Faculty Diversity* (2003). Cole and Barber undertook their research in large part at the urging of Harvard President Neil Rudenstein, and the Council of Ivy League Presidents financially supported their work. The purpose of the study was to understand why there were so few underrepresented minorities—particularly African Americans—in the academic pipeline leading to university faculty positions.

394.    Cole and Barber found that a prime cause of the constrained pipeline was academic mismatch. Promising African American and Hispanic students who were interested in academic careers sought to go to selective colleges. Through the operation of racial preferences, these students often found themselves being admitted and courted by super-elite colleges, and often unwittingly found themselves at schools where their level of academic preparation was far below the median. In these environments, the students survived but did not flourish. Their grades tended to be well below the median, and in large numbers they soured on the prospect of pursuing a career in academia. The study found that otherwise similar students who went to less elite schools—such as

91

flagship state universities—performed better and retained their interest in academic careers at much higher rates.

395.    Harvard also has a documented "mismatch" problem in the sciences.  In 2004, two psychologists at the University of Virginia published a peer-reviewed study of minority attrition in the sciences.  *See* Frederick L. Smyth and John J. McArdle, *Ethnic and Gender Differences in Science Graduation at Selective Colleges With Implications For Admission Policy and College Choice*, Research In Higher Education, Vol. 45, No. 4 (June 2003).  These scholars gained permission to use the College and Beyond dataset assembled by the Mellon Foundation.  This dataset, which included comprehensive data from several Ivy League colleges (Columbia, Princeton, and Yale) as well as approximately twenty less selective schools, served as the basis for the well-known study of affirmative action, The Shape of the River (1998).

396.    Smyth and McArdle examined what factors affected the success of students in science, technology, engineering, and math ("STEM") fields of study.  They found that a critical factor was a student's academic preparation relative to her peers.  Moreover, they found that this effect was essentially identical for white, African American, and Hispanic students.  In all cases, students who attended a school where their level of academic preparation was substantially lower than those of their peers were far more likely to drop out of STEM fields as compared to identical students who attended schools where their relative peer position was higher.  The effect was so large that Smyth and McArdle advised high school counselors to take potential mismatch into account in helping students understand the pros and cons of attending "reach" schools.

397.    In 1996, a group of researchers at Dartmouth University, led by Dartmouth psychologist Rogers Elliott, published a peer-reviewed study that examined rates of STEM attrition at four Ivy League colleges.  *See* Rogers Elliott, A. Christopher Strenta, Russell Adair, Michael Matier and Jannah Scott, *The Role of Ethnicity in Choosing and Leaving Science in Highly Selective Institutions*, 37 Research in Higher Education 681 (1996).  They found that although African-American freshmen aspired to STEM majors at roughly the same rate as other students, only about 10 percent of African-American aspirants actually achieved bachelor degrees in STEM fields.  Many of these students switched to majors in the humanities and social sciences; some failed to graduate at all.  The study found that a principal reason for the high attrition rate of African Americans was their relative position among a group of peers who generally had much higher levels of academic preparation, and could thus compete effectively in the demanding, sequential, rigorously graded STEM curricula.

398.    Harvard has disregarded the "mismatch effect" that is harming the many African American and Hispanic students who are admitted to and enroll at Harvard because of its large admissions preference.

399.    Harvard can eliminate this harmful mismatch and allow students to excel at schools for which they are most prepared by eliminating the use of racial preferences and employing race-neutral alternatives that bring high-performing, socioeconomically disadvantaged minorities into the applicant pool.

## XI.    GOVERNING LAW

400.    Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

401.     Under Title VI, "the term 'program or activity' and the term 'program' mean all of the operations … of a college, university, or other postsecondary institution, or a public system of higher education … any part of which is extended Federal financial assistance." 42 U.S.C. § 2000d-4a.

402.     An institution that accepts federal funds violates Title VI when it engages in racial or ethnic discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.  *See Gratz v. Bollinger*, 539 U.S. 244, 257 n.23 (2003) ("We have explained that discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI.") (citing *Alexander v. Sandoval,* 532 U.S. 275, 281 (2001)).

403.     The Fourteenth Amendment provides, in relevant part, that no person shall be denied "the equal protection of the laws."  The "central mandate" of equal protection is "racial neutrality" by the government or institution subject to the Fourteenth Amendment.  *Miller v. Johnson*, 515 U.S. 900, 904 (1995).  "Whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229-30 (2000).

404.     "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher*, 133 S. Ct. at 2419 (citations and quotations omitted).

Thus, "any official action that treats a person differently on account of race or ethnic origin is inherently suspect." *Id.* (citation and quotations omitted). In other words, "because racial classifications so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications be subjected to the most rigid scrutiny." *Id.* (citations and quotations omitted).

405. "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227. "Strict scrutiny is a searching examination, and it is the government [or institution subject to the Fourteenth Amendment through Title VI] that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher*, 133 S. Ct. at 2419 (citations and quotations omitted). Strict scrutiny thus requires a "detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed." *Adarand*, 515 U.S. at 227.

406. In particular, strict scrutiny requires a "detailed examination, both as to ends and to means." *Adarand*, 515 U.S. at 236. When those governmental or other institutions subject to the Fourteenth Amendment directly or through Title VI implement policies and practices that "touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest." *Fisher*, 133 S. Ct. at 2417 (citations and quotations omitted).

407. Racial "classifications are constitutional only if they are narrowly tailored to further compelling governmental interests." *Grutter*, 539 U.S. at 326.

408.    "Strict scrutiny requires the university to demonstrate with clarity that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is necessary to accomplish that purpose." *Fisher*, 133 S. Ct. at 2418.

409.    To meet strict scrutiny, the end must be "compelling"—not merely legitimate or important.  To be narrowly tailored, "the means chosen" must "fit" the unmet compelling interest "so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493 (citations and quotations omitted).  In other words, "racial classifications, however, compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands." *Grutter*, 539 U.S. at 342.

410.    "To survive strict scrutiny," moreover, the institution "must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992).  The institution must establish the necessity of using race by a "strong basis in evidence" because "the mere recitation" of a compelling interest is "not an automatic shield which protects against any inquiry" into the justification for race-based action."  *Croson*, 488 U.S. at 495, 500.

411.    Strict scrutiny "forbids the use even of narrowly drawn racial classifications except as a last resort."  *Id*. at 519 (Kennedy, J., concurring in part and concurring in the judgment).

412.    An institution's use of race or ethnicity that is in any way motivated by "prejudice or stereotype" against a particular group violates the Fourteenth Amendment and therefore violates Title VI.  *Croson*, 488 U.S. at 493.  "[T]he Equal Protection Clause

prohibits a State [or institution subject to the Fourteenth Amendment through Title VI] from taking any action based on crude, inaccurate racial stereotypes." *Batson v. Kentucky,* 476 U.S. 79, 104 (1986); *see also Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir. 1999) ("Title VII's prohibition against 'disparate treatment because of race' extends both to employer acts based on conscious racial animus and to employer decisions that are based on stereotyped thinking or other forms of less conscious bias.").

413.    In addition to direct evidence of discrimination, racial "prejudice or stereotype" may be proven through circumstantial evidence. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."). The Supreme Court has identified five, non-exhaustive "subjects of proper inquiry in determining whether racially discriminatory intent existed" based on circumstantial evidence. *Id.* at 268.

414.    First, the Court looks to whether the policy, notwithstanding its purportedly neutral rationale, "bears more heavily on one race than another. . . . Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id*. at 266.

415.    Second, the Court looks to "the historical background" of the policy, "particularly if it reveals a series of official actions taken for invidious purposes." *Id.* at 267.

416.    Third, "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Id*.

417.    Fourth, "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.  Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id*.

418.    Fifth, and last, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id*. at 268.

419.    Even if not motivated by prejudice or stereotype, a racial classification violates the Fourteenth Amendment and therefore violates Title VI if it is a quota.  In the educational setting, then, "universities cannot establish quotas for members of certain racial groups or put members of those groups on separate admissions tracks.  Nor can universities insulate applicants who belong to certain racial or ethnic groups from the competition for admission." *Grutter*, 539 U.S. at 334 (citation omitted).

420.    Moreover, a university's policy violates the Fourteenth Amendment and therefore violates Title VI if it amounts to "racial balancing, which is patently unconstitutional." *Id*. at 329.  Racial balancing is a program designed "to assure within [the school's] student body some specified percentage of a particular group merely because of its race or ethnic origin." *Id*. (citations and quotation omitted). "[P]roportional representation" is never a constitutional "rationale for programs of preferential treatment." *Id*. at 343.

421.    The only interest in using racial preferences in higher education that the Supreme Court has accepted as "compelling" is the interest "in obtaining the educational benefits that flow from a diverse student body." *Grutter*, 539 U.S. at 343.  Redressing past discrimination does "not serve as a compelling interest, because a university's broad mission of education is incompatible with making the judicial, legislative, or administrative findings of constitutional or statutory violations necessary to justify remedial racial classification." *Fisher*, 133 S. Ct. at 2417 (citations and quotations omitted).

422.    The interest in student body diversity the Supreme Court has found compelling "is not an interest in simply ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Fisher*, 133 S. Ct. at 2418 (citation and quotations omitted).  "[C]ritical mass is defined by reference to the educational benefits that diversity is designed to produce." *Grutter*, 539 U.S. at 330.

423.    Even in the pursuit of critical mass, the Supreme Court has permitted race to be used only as a "plus" factor in admissions decisions. *Id*. at 333.  "[I]t remains at all times the University's obligation to demonstrate, and the Judiciary's obligations to determine, that admissions processes 'ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application.'" *Fisher*, 133 S. Ct. at 2418 (quoting *Grutter*, 539 U.S. at 337).  Thus, even if "the University has established that its goal of diversity is consistent with strict scrutiny, … there must still be a further judicial determination that the admissions process meets strict scrutiny in its implementation.  The University must

prove that the means chosen by the University to attain diversity are narrowly tailored to that goal." *Id*. at 2419-20.

424.  "Narrow tailoring also requires that the reviewing court verify that it is 'necessary' for a university to use race to achieve the educational benefits of diversity. This involves a careful judicial inquiry into whether a university could achieve sufficient diversity without using racial classifications."  *Id*. at 2420 (internal citation omitted). Accordingly, strict scrutiny uniformly "require[s] a court to examine with care, and not defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives.'" *Id.* (quoting *Grutter*, 539 U.S. at 339- 340).

425.  "Consideration by the university is of course necessary, but it is not sufficient to satisfy strict scrutiny: The reviewing court must ultimately be satisfied that no workable race-neutral alternatives would produce the educational benefits of diversity. If a nonracial approach … could promote the substantial interest about as well and at tolerable administrative expense, then the university may not consider race."  *Id*. (citations and quotations omitted).

426.  As a consequence, "strict scrutiny imposes on the university the ultimate burden of demonstrating, *before turning to racial classifications*, that available, workable race-neutral alternatives do not suffice." *Id*. (emphasis added).

## XII.  CLAIM FOR RELIEF

427.  Harvard's use of racial preferences in undergraduate admissions violates Title VI of the Civil Rights Act of 1964.  Plaintiff should be granted relief on that claim for a host of reasons.  First, Harvard is intentionally discriminating against Asian-American applicants.  Second, Harvard is engaging in racial balancing.  Third, Harvard's

use of racial preference is not narrowly tailored because Harvard is not pursuing the critical-mass interest found permissible in *Grutter*. Fourth, Harvard's use of racial preferences is not narrowly tailored because Harvard is not using this disfavored tool merely to fill the "few places" left in its incoming class contrary to the "Harvard College Admissions Program" submitted to the Supreme Court in *Bakke*. Fifth, Harvard is not fully utilizing a number of race-neutral alternatives that can achieve student body diversity. Finally, whether or not Harvard is found to be acting permissibly under Supreme Court precedent, the Supreme Court should overrule any decision holding that the Fourteenth Amendment and therefore Title VI ever permits the use of racial preferences to achieve "diversity."

## COUNT I

### Violation of 42 U.S.C. § 2000d *et seq.*
### (Intentional Discrimination Against Asian Americans)

428.     Plaintiff incorporates the allegations and averments contained in paragraphs 1-427 as if fully set forth herein.

429.     Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an undergraduate admissions policy that intentionally discriminates against Asian-American applicants on the basis of race or ethnicity.

430.     Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process. *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the

Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

431.    Title VI is privately enforceable.

432.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

433.     An institution's use of race or ethnicity that is in any way motivated by prejudice or stereotype against a particular group violates the Fourteenth Amendment and therefore violates Title VI.

434.    Harvard has intentionally discriminated against Asian-American applicants for admission on the basis of race or ethnicity based on prejudicial and stereotypical assumptions about their qualifications.

435.    Harvard officials have made prejudicial and stereotypical statements about Asian-American applicants for admission.  Among other things, Harvard officials have made racially stereotypical statements assuming that, as a group, Asian Americans all have same academic interests, experiences, and personal attributes and that Asian Americans, as a group, lack certain qualities that Harvard values.

436. Harvard's admissions system has a disproportionately negative effect on Asian-American applicants for admission that is not explainable on grounds other than intentional discrimination on the basis of race or ethnicity. As the statistical evidence demonstrates, Asian Americans are underrepresented at Harvard in relation to their share of the applicant pool and are massively underrepresented in relation to the share of the highly qualified portion of Harvard's applicant pool. Asian Americans represent roughly 46 percent of the highly qualified portion of Harvard's applicant pool, yet they represent only about 17 percent of those admitted and/or enrolled at Harvard over a multi-year period.

437. Harvard has a long and unfortunate history of intentional discrimination on the basis of race or ethnicity, including a history of intentional discrimination against Asian Americans. The Harvard Plan itself is a product of admissions policies created to advance an invidious purpose. Harvard has a history of using the rubric of "holistic" admissions in general, and the Harvard Plan in particular, to limit the admission of Jewish applicants and other minority groups. Indeed, Harvard is using the same pretextual excuses to justify its disparate treatment of Asian Americans that it used to deny that it was discriminating against Jewish applicants in the past. In short, Harvard's intentional discrimination against Asian-American applicants exhibits the same pattern as its previous discrimination against Jewish applicants.

438. Harvard's departure from its normal procedures, including its abrupt decision to no longer make public the application figures grouped by racial category, demonstrates that steps were taken for the improper purpose of engaging in intentional discrimination on the basis of race or ethnicity.

439.   Harvard's substantive decision to abandon or place considerably less reliance, when it comes to Asian Americans, on the academic factors it usually considers important for purposes of granting or denying admission demonstrates that Harvard is engaging in intentional discrimination on the basis of race or ethnicity.

440.   Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

441.   Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

442.   Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### COUNT II

**Violation of 42 U.S.C. § 2000d *et seq.***
**(Racial Balancing)**

443.   Plaintiff incorporates the allegations and averments contained in paragraphs 1-442 as if fully set forth herein.

444.   Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an

Case 1:14-cv-14176-ADB Document 1 Filed 11/17/14 Page 105 of 120

undergraduate admissions policy that balances the class according to its racial or ethnic composition.

445.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,'" and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

446.    Title VI is privately enforceable.

447.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

448.    A university that uses its admissions system to pursue quotas or proportional representation of racial or ethnic groups either in the entering class or in the overall student body violates the Fourteenth Amendment and therefore violates Title VI.

449.     The remarkable stability of Harvard's admissions figures across racial and ethnic groups—especially in the overall student body—demonstrates that Harvard is seeking proportional representation and therefore is engaged in racial balancing.

450.     There is no non-discriminatory reason that could justify admissions figures this stable across all racial groups over a period of several years given the unique characteristics of each applicant for admission.  If Harvard were truly treating each applicant for admission as an individual, as it professes to do, "[o]ne would expect the percentage of specified minority enrollees produced by such a such a system to vacillate widely from year to year, reflecting changes in each year's applicant pool."  Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 382 n.13 (1979).  That is not happening.

451.     The pursuit of "critical mass" could never justify admissions figures this stable given the balancing that occurs between African-American and Hispanic applicants.  But even if the pursuit of "critical mass" led to stable admissions figures for African Americans and Hispanics, which it did not, that would not provide a non-discriminatory explanation for why the white and Asian-American admissions and enrollment figures have been this stable over a multi-year period.

452.     The stability of Harvard's admission and enrollment figures across all racial groups notwithstanding the massive changes in the racial and ethnic makeup of Harvard's admissions pool over time—especially the significant increase in highly qualified Asian-American applicants—confirms that Harvard is engaged in racial balancing.

453.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

454.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

455.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT III

### Violation of 42 U.S.C. § 2000d *et seq.*
### (Failure To Use Race Merely As A "Plus" Factor In Admissions Decisions)

456.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-455 as if fully set forth herein.

457.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an undergraduate admissions policy that is not narrowly tailored because it does not use race merely as a "plus" factor in order to achieve student body diversity.

458.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for

violations of Title VI if it is found to have discriminated on the basis of race in its admissions process. *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

459. Title VI is privately enforceable.

460. Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

461. Harvard is not complying with the requirement of narrow tailoring because it is not using race merely as a "plus" factor in admissions decisions in order to achieve student body diversity.

462. The statistical evidence shows that each applicant for admission is not evaluated as an individual. Instead, race or ethnicity is the defining feature of the application. That is especially true for Asian-American applicants. Only using race or ethnicity as a dominant factor in admissions decisions could account for the remarkably low admission rate for high-achieving Asian-American applicants.

463.  Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

464.  Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

465.  Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT IV

**Violation of 42 U.S.C. § 2000d *et seq*.**
**(Failure To Use Race To Merely Fill The Last**
**"Few Places" In The Incoming Freshman Class)**

466.  Plaintiff incorporates the allegations and averments contained in paragraphs 1-465 as if fully set forth herein.

467.  Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., by employing an undergraduate admissions policy that is not narrowly tailored because it does not merely use race as a factor in filling the last "few places" in the entering freshman class.

468.  Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for

violations of Title VI if it is found to have discriminated on the basis of race in its admissions process. *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

469.    Title VI is privately enforceable.

470.    Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

471.    In its *Bakke amicus* brief, Harvard informed the Supreme Court that it was using race as a factor in admissions decisions only when it had "a few places left to fill" in the entering freshman class. But to the extent that Harvard ever used race in this way, given that the Harvard Plan itself was the product of racial and ethnic discrimination, it clearly is no longer using race in this fashion.

472.    In its *Fisher amicus* brief, Harvard stated that it uses admissions "policies similar to the Harvard Plan that Justice Powell approved in [*Bakke*] and the University of Michigan Law School plan upheld in *Grutter*." But an admissions policy similar in any fashion to the plan employed by the University of Michigan Law School by definition

uses race beyond filling the remaining few places. In such a plan, race is—to one degree or another—a factor for every applicant as it is ostensibly being used to pursue a "critical mass" of underrepresented minorities in the overall student body.

473. Moreover, the statistical evidence demonstrates that Harvard is not using race merely to fill the last few places in the entering freshman class. Rather, especially for Asian Americans, race or ethnicity is a factor in admissions decision far beyond those competing for the last few places. Only using race or ethnicity as a dominant factor in admissions decisions could account for the remarkably low admission rate for high-achieving Asian-American applicants.

474. Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

475. Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

476. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT V

### Violation of 42 U.S.C. § 2000d *et seq.*
### (Race-Neutral Alternatives)

477.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-476 as if fully set forth herein.

478.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing racial preferences in undergraduate admissions when there are available race-neutral alternatives capable of achieving student body diversity.

479.    Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

480.    Title VI is privately enforceable.

481.     Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

482.     Harvard's use of racial preferences is narrowly tailored only if using them is necessary to achieve student body diversity.  If Harvard can achieve student body diversity without resorting to racial preferences, it is required to do so as a matter of law. Moreover, Harvard must have a strong basis in evidence that a non-racial approach will not work about as well as a race-based approach *before* turning to the use of racial preferences.

483.     There is no evidence that Harvard studied all of the available race-neutral alternatives and had a strong basis in evidence that none would work about as well as a race-based approach *before* turning to racial preferences.  Indeed, Harvard claims that it has been using racial preferences—to one degree or another—continuously for nearly a century.

484.     Whether Harvard considered them all or not, there are a host of race-neutral alternatives that if implemented can achieve student body diversity without resorting to racial preferences.   Among these alternatives, both individually and collectively, are (a) increased use of non-racial preferences, (b) increased financial aid, scholarships, and recruitment efforts, and (c) elimination of admissions policies and practices that negatively affect minority applicants.

485.     The use of race-neutral alternatives instead of racial preferences would not only achieve student body diversity, it would eliminate the heavy costs that using race as

a factor in admissions decisions imposes on minority applicants who receive such admissions preference, the Harvard community, and society as a whole.

486.    Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

487.    Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

488.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VI

### Violation of 42 U.S.C § 2000d *et seq.*
### (Any Use of Race As A Factor In Admissions)

489.    Plaintiff incorporates the allegations and averments contained in paragraphs 1-488 as if fully set forth herein.

490.    Harvard, a recipient of federal funds, intentionally discriminated against certain of Plaintiff's members on the basis of their race, color, or ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, by employing an undergraduate admissions policy that uses race as a factor in admissions.

491.     Harvard has conceded that, because it uses a racial criterion in its admissions process and receives federal funds, it is subject to potential liability for violations of Title VI if it is found to have discriminated on the basis of race in its admissions process.  *See* Harvard *Grutter* Amicus Brief at 2 ("Because Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination,' the ability of private colleges and universities to exercise their institutional competence could well be dramatically compromised by any new limits . . . on state university admissions criteria or procedures."); Harvard *Fisher* Amicus Brief 3 (stating that "Title VI of the Civil Rights Act of 1964 forbids institutions that receive federal funds from engaging in racial 'discrimination," and so Harvard's "efforts to attain diverse student bodies could be compromised" if limits were placed on the university's admissions procedures).

492.     Title VI is privately enforceable.

493.     Discrimination that violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution constitutes a violation of Title VI when committed by an institution that accepts federal funds.

494.     The Supreme Court's decisions holding that there is a compelling government interest in using race as a factor in admissions decisions in pursuit of "diversity" should be overruled.  Those decisions were wrongly decided at the time they were issued and they remain wrong today.  "Diversity" is not an interest that could ever justify the use of racial preferences under the Fourteenth Amendment and Title VI.

495.    Even if there were a compelling government interest in "diversity" in the abstract, however, the use of racial preferences in the educational setting nevertheless should be forbidden for several important reasons.

496.    The Supreme Court's jurisprudence in this area has been built on mistakes of fact and law.  The Supreme Court first accepted the use of racial preferences in admissions on the assumption that they would be used consistent with the Harvard Plan, which purported to use race merely as a contextual factor in filling the final few places in the entering class.  But the Harvard Plan itself was created in order to hide racial and ethnic discrimination.  Thus, it is far from certain that Harvard has *ever* used race in the way the Supreme Court envisioned.

497.    "The raison d'être for race-specific affirmative action programs has simply never been diversity for the sake of education."  Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 407 (1979).  It is instead "a clever post facto justification for increasing the number of minority group students in the student body." *Id*.

498.    In any event, neither Harvard nor any other college or university uses race in this manner now.  Instead, colleges and universities, including Harvard, claim to use race in order to pursue a "critical mass" of underrepresented minorities in the student body.  But Harvard, and many others, are not pursuing this interest.  Even when this interest is actually being pursued, moreover, it is nothing more than racial balancing in that it necessarily seeks to ensure a proportional number of students of certain races or ethnicities in the entering class.  Critical mass is a formula for ensuring "a specified

percentage of the student body is in effect guaranteed to be members of selected ethnic groups, with the remaining percentage an undifferentiated aggregation of students." *Bakke*, 438 U.S. at 315 (Powell, J.).

499.    Ultimately, there is overwhelming evidence that colleges and universities will take advantage of any leeway given by the Supreme Court to use the dangerous tool of racial preferences in inappropriate ways.  The experience with Harvard confirms that, if given the chance, colleges and universities will use racial preferences "for the ostensible purpose of enhancing education diversity of the student body" with the true "goal of simply increasing the number of minority persons in the universities and in the professions that these universities feed."  Alan Dershowitz and Laura Hanft, *Affirmative Action and the Harvard College Diversity-Discretion Model: Paradigm or Pretext*, 1 Cardozo L. Rev. 379, 385 (1979).

500.    There simply is no practical way to ensure that colleges and universities will use race in their admissions processes in any way that would meet the narrow tailoring requirement.  The strong medicine of strict scrutiny has proven insufficient to ensure that the Fourteenth Amendment and Title VI operate in conformity of racial neutrality except in those rare circumstances that justify the use of this disfavored remedy.  Time after time, district courts and the courts of appeals have been either unwilling or unable to force these colleges and universities to provide a strong evidentiary basis for their conclusion that use of racial preferences is *necessary* to achieve diversity.  Nor have they been willing to engage in the close review of admissions programs to ensure that schools are treating each applicant as an individual.

501.     There also have been important factual developments since this question was last considered by the Supreme Court.  There is now much evidence that race-neutral alternatives can achieve the benefits of diversity.  This is crucially important in light of the equally compelling evidence that racial preferences impose significant costs on the university community, society in general, and the very minority students these programs are purported to benefit.

502.     In the end, the costs of allowing the use of racial preferences in admissions decisions—even in a limited way—far exceed any rapidly diminishing benefits.  No principle of *stare decisis* counsels in favor of retaining decisions allowing their use.  Those decisions were not well reasoned, were predicated on mistakes of fact, have been undermined by more recent developments, and have proven to be unworkable.  Any decision allowing the use of racial preferences in the educational setting should be overruled.

503.     Plaintiff's members have been and will continue to be injured because Harvard has and will continue to deny them the opportunity to compete for admission to Harvard on equal footing with other applicants on the basis of race or ethnicity due to its intentionally discriminatory admissions policies and procedures.

504.     Plaintiff is entitled to a declaratory judgment, pursuant to 28 U.S.C. § 2201, and a permanent injunction because there is no plain, adequate, or speedy remedy at law to prevent Harvard from continuing to use admissions policies and procedures that discriminate on the basis of race or ethnicity in violation of Title VI of the Civil Rights Act of 1964 and because the harm Plaintiff's members will otherwise continue to suffer is irreparable.

505.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiff, Students for Fair Admissions, Inc., prays for the following relief as to all counts:

(a)     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court that Harvard's admissions policies and procedures violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.;

(b)     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court that any use of race or ethnicity in the educational setting violates the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.;

(c)     A permanent injunction prohibiting Harvard from using race as a factor in future undergraduate admissions decisions;

(d)     A permanent injunction requiring Harvard to conduct all admissions in a manner that does not permit those engaged in the decisional process to be aware of or learn the race or ethnicity of any applicant for admission;

(e)     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

(f)     All other relief this Court finds appropriate and just.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all triable issues.

Respectfully submitted.

By: _____

Paul M. Sanford BBO #566318                William S. Consovoy
Benjamin C. Caldwell BBO #67506            Thomas R. McCarthy
BURNS & LEVINSON LLP                       J. Michael Connolly
One Citizens Plaza, Suite 1100             CONSOVOY MCCARTHY PLLC
Providence, RI  02903                      3033 Wilson Boulevard
Tel: 617-345-3000                          Suite 700
Fax: 617-345-3299                          Arlington, Virginia 22201
psanford@burnslev.com                      Tel: 703.243.4923
bcaldwell@burnslev.com                     Fax: 703.243.4923
                                           will@consovoymccarthy.com
                                           tom@consovoymccarthy.com
                                           mike@consovoymccarthy.com

                                           *Counsel for Plaintiff Students for Fair
Dated: November 17, 2014                   Admissions, Inc.*